# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOVE ALTONIO BROOKS, | : | CIVIL NO. 3:12-CV-00067 |
| | : | |
| Plaintiff, | : | (Judge Munley) |
| | : | |
| v. | : | |
| | : | |
| B.A. BLEDSOE, *et al.*, | : | |
| | : | (Magistrate Judge Schwab) |
| Defendants. | : | |

## REPORT AND RECOMMENDATION

In this prisoner lawsuit proceeding *via* an amended complaint, the *pro se* plaintiff, Love Altonio Brooks ("Brooks"), has filed claims pursuant to the Federal Torts Claims Act (the "FTCA"), 28 U.S.C. § 2675, *et seq.* and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), relating to his imprisonment at USP Lewisburg in 2011. Pending before the Court are two motions: (1) Brooks' own motion for summary judgment and (2) the remaining defendants' motion to dismiss and for summary judgment. For the following reasons, Brooks' motion should be denied and the remaining defendants' motion should be granted in part and denied in part.

## I.    Background and Relevant Procedural History.

Brooks initiated this lawsuit on January 11, 2012, *Doc.* 1, and, several days later, he paid the requisite filing fee. *Doc.* 5. In his initial complaint, Brooks brought constitutional tort claims pursuant to *Bivens* and the FTCA. *See Doc.* 1.

Furthermore, Brooks named as defendants the United States of America and the following federal prison staff: (1) Bryan Bledsoe ("Bledsoe"), the former Warden at USP Lewisburg; (2) Donald Hudson ("Hudson"), the Associate Warden at USP Lewisburg; (3) Sean Snyder ("Snyder"), a Deputy Captain at USP Lewisburg; (4) Bradley Trate ("Trate"), a Captain at USP Lewisburg; (5) Ty Crawley ("Crawley"), a Corrections Officer at USP Lewisburg; (6) Dennis Kepner ("Kepner"), a Senior Officer at USP Lewisburg; (7) Danielle Mink ("Mink"), a Psychologist; (8) Shannon Prutzman ("Prutzman"), a Senior Officer Specialist at USP Lewisburg; (9) "Unknown Officials"; and (10) "Officer Smith." *Id.*

After the properly identified defendants listed above had been served with the complaint, they moved to dismiss it and for the entry of summary judgment. *Doc.* 14. Thereafter, on May 18, 2012, the Court entered a case management order setting a deadline of November 2, 2012, for any discovery-related motions. *Doc.* 15. In addition, the discovery period was set to close on November 16, 2012. *Id.* While those deadlines were on-going, Magistrate Judge Smyser entered a Report and Recommendation on the defendants' first motion to dismiss and for summary judgment. *Doc.* 31. Before the Court could rule on said motion *via* the Report and Recommendation entered by Judge Smyser, Brooks filed a motion for leave to amend his complaint, *Doc.* 32, which the Court granted. *Doc.* 34. On September 24, 2012, Brooks filed his amended complaint. *Doc.* 38.

2

In the amended complaint, Brooks names the same defendants as before plus the following: (1) Harrell Watts ("Watts"), the Administrator of National Appeals; (2) J.L. Norwood, the Regional Director; (3) A. Jordan, a Disciplinary Hearing Officer ("DHO"); (4) A. Cotterall, a Case Manager; and (5) D. Young, an Associate Warden. *See Doc.* 38-1. At the outset, Brooks claims that he had been retaliated against by staff at USP Lewisburg for having previously prevailed in a federal lawsuit against other staff members at the prison[1] and for having filed new administrative remedies.[2] Brooks is also clear at the outset that one of his claims is a challenge to the policy at USP Lewisburg of prohibiting inmates from possessing "plain nudity material and [Uniform Commercial Code ("UCC")] material." *Doc.* 38 at 1.

To support his claims, Brooks first alleges that on January 12, 2011, while other inmates on his floor attended "inside recreation, [his] rec cage group" was sent outside to ice-covered recreational cages. *Id.* Moreover, Brooks complains that inside of the cages no salt was spread on the ground, and that when he asked

---

[1]    As the Court already pointed out, *see Doc.* 50 at 3 n. 1, Brooks received a $5,000 settlement award in a previous *pro se Bivens* action. *See Brooks v. Smith*, No. 3:04-CV-2680 (M.D. Pa.)(*Docs.* 113 & 114).

[2]    In detailing Brooks' allegations from his amended complaint, we accept his allegations as true, consistent with the motion to dismiss standard of review, *infra.*

why he was going outside, "an officer" stated "[y]ou shouldn't be testifying against officers." *Id.*

Three weeks later, Brooks claims that while he was in the midst of discussing an administrative remedy he had filed, "in regards to psychology turning a blind eye towards the negative psychological effects on the SMU program and its application," Dr. Mink loudly, and "falsely," accused him of fondling his penis while wearing no pants. *Id.* According to Brooks, this drew the unwanted attention from inmates in the vicinity, including his cellmate at the time. The attention was unwanted because, according to Brooks, there is a "foul stigma" among the prison population against those who "masturbate to female staff." Dr. Mink also allegedly told Brooks: "If you want to play these games, we can play, you and [your group of inmates who filed administrative remedies about the psychology department]." *Id.*

Approximately two weeks later, Brooks then claims that while he was in his cell on G-Block, tear gas was deployed to stop a fight. The gas ended up filtering into Brooks' cell, "hindering [his] breathing, irritating [his] throat and eyes, causing [him] to choke and spew phlegm. . . ." *Id.* at 2. Furthermore, "[s]taff" turned off the fans and refused to turn them back on in order to disperse the fumes, and "[m]edical" ignored his pleas for assistance. *Id.*

4

On March 24, 2011, following the previous incident, Brooks claims that "Officer Smith" ordered his "escorting c.o." to leave Brooks' property outside of his cell.  Subsequently, "Officer Smith" took some of Brooks' property, including a radio, legal materials, and other personal items.  An hour after "Officer Smith" took said property, Prutzman, who was smiling and flanked by other officers, returned to the cell block and placed a meshed bag inside of Brooks' cell.  The meshed bag contained the property that was previously taken by "Officer Smith." As Prutzman placed said bag of property into Brooks' cell, he (i.e., Prutzman) stated, "Officer Rogers is a friend of mine."  *Id.*  According to Brooks, Officer Rogers was one of the individuals he had previously sued in federal court.  Also, with respect to the property that Prutzman allegedly returned to Brooks' cell, it was covered in prayer oil that Brooks had kept with him.  Brooks further alleges, with respect to the same incident, that a "fake confiscation form" was filled out.  On that form, only a bag of coffee and a bottle of vitamins were reportedly taken from Brooks.

On the same date that some of his property was allegedly taken and then returned, Brooks avers that "Officer Smith" refused to provide him with sheets, blankets, or toilet paper.  In addition, "another c.o." returned other items to him that had been taken by "Officer Smith," and the "c.o." said that some of his (i.e., Brooks') property was found in the trash.  Two weeks thereafter, on April 1, 2011,

5

while he was housed on D-Block, Brooks claims that "C.O. Smith" denied him a shower in retaliation for having filed an administrative remedy about the taking of his personal belongings.

Subsequently, on April 14, 2011, Kepner denied Brooks with recreation, and Brooks filed another administrative remedy.  Thereafter, on May 13, 2011, Kepner changed Brooks' "rec-group" and added a prisoner who had had multiple altercations while confined in the SMU.  That prisoner was also to be placed on "single rec status."  *Id.* at 3.  On Brooks' way outside to the "rec cage," Kepner sneered at him and said, "[l]et's see how this works out."  *Id.*  Then, as soon as Brooks entered the "rec cage," that other prisoner charged at him, and a scuffle broke out.  During the incident inside of the "rec cage," Crawley allegedly did nothing, leaving Brooks inside of the cage.  Once Brooks was removed from the cage, he claims that "medical" did not assess his injuries.[3]

Regarding the fight inside of the "rec cage," Brooks claims that he was only defending himself.  Nevertheless, Brooks was given an incident report for fighting and, as a result, he had to restart the SMU program.  In the incident report, Crawley provided that Brooks stepped into the cage and engaged in a fight. Following the issuance of the incident report, a disciplinary hearing was held

---

[3]     Brooks later identifies Gregory George ("George") as the individual who should have provided him with -- but allegedly didn't – medical care following the altercation with the other inmate. *See, infra,* Part IV.A.

where Jordan found Brooks guilty of fighting.   During the hearing, Jordan informed Brooks that his named witness refused to make a statement and also switched out Brooks' requested staff representative.   Furthermore, Jordan's finding of guilt was premised upon Crawley's statement in the incident report.

In the amended complaint, Brooks next turns to a myriad of general allegations and claims.   According to Brooks, he was forced to live in a cell for 23 hours per day, with a cellmate, even though the cells in which he lived were only large enough for a single person.   As a result, there is no room to pace or exercise during inclement weather, and said conditions cause more violence.   Additionally, Brooks avers that if a prisoner complains about not getting along with his cellmate, the complaints fall on deaf ears.   Consequently, Brooks claims that he had to engage in a number of hunger strikes to get his point across.   Otherwise, Brooks alleges that if a prisoner complains too much about his cellmate, the prisoner is placed in shackles for "prolonged periods," and officials "lie and say you threatned them or your . . . cellmate to justify the shackles."   *Id.* at 4.   While shackled, Brooks claims that inmates are exposed to attacks from other inmates, and the shackles also leave visible marks on an inmate's body.   *See id.* at 4-5.   Moreover, in regards to the types of cellmates at USP Lewisburg, Brooks claims that prisoners are forced to cell with individuals who take psychiatric medications,

"compulsive[ly] masturbate[e]," and have made it known they do not want to share a cell; the placement of these inmates, in turn, often results in more violence. *Id.*

Next, Brooks complains that unnamed officials respond to violence at the prison with "excessive amounts of tear gas which affects the entire range and [that] prisoners are pelted with pepperballs that leave livid bruises." *Id.* at 4-5. As well, Brooks complains that in the cells where he was assigned at USP Lewisburg, unlike those located on "Z-block," there were no duress buttons, no ladders to access the top bunk bed, no storage areas, and only one desk to eat a meal. In the same vein, Brooks complains that the ventilation was "grossly inadequate" and inmates are only allowed three showers per week. *Id.* at 5. Furthermore, Brooks complains that visitations are severely restricted in that he is only permitted 1-hour visitations *via* video with immediate family members.

Last, Brooks provides allegations relating to his challenge to the prison's bans on UCC and "plain nudity" materials. According to Brooks, Bledsoe adopted the policy relating to the ban on UCC materials at USP Lewisburg on January 20, 2011. Moreover, regarding the ban on "plain nudity materials," on five occasions Young "rejected" a number of Brooks' books and photographs for containing "plain nudity and / or [sic] sexually explicit material." *Id.* at 6. Brooks avers that written materials were to be exempted from the prison's policy. Out of animosity towards him, however, he claims that his written materials were rejected. *Id.*

8

Further, because of said policy, there has been an increase in "sexually deviant behavior that has reached epidemic proportions." *Id.* Brooks alleges that the ban has caused prisoners to "openly stalk[] and masturbat[e] to female staff . . , which[, in turn,] has triggered violence. . . ." *Id.*

Based on these allegations, Brooks provides that he raises claims pursuant to *Bivens*, for violations of the First, Fifth, and Eighth Amendments to the United States Constitution. *Id.* at 8. Brooks further asserts that he raises claims against the United States Government for negligence and intentional infliction of emotional distress under the FTCA. *Id.* For remedies, Brooks seeks injunctive relief as to the ban on UCC and "plain nudity" materials, in addition to compensatory and punitive damages for all claims. *Id.*

Once Brooks filed his amended complaint, Chief Magistrate Judge Carlson conducted a screening review pursuant to 28 U.S.C. § 1915A. *See Doc.* 39. Judge Carlson's recommendations were then adopted by the Court on November 29, 2012. *Doc.* 50. As such, Brooks' amended complaint was dismissed with prejudice as to Bledsoe, Hudson, Snyder, Trate, Watts, and Norwood, with the exception of Brooks' complaint that Bledsoe adopted an unconstitutional policy of prohibiting UCC and "plain nudity" materials. *Id.* at 16. Additionally, Brooks' claims for a specified sum of unliquidated damages were stricken from the

amended complaint. *See id.*[4] On December 17, 2012, following the Court's ruling, Brooks filed an appeal to the Third Circuit. *Doc.* 55. On March 27, 2013, the Circuit Court dismissed the appeal for Brooks' failure to timely prosecute, but the order was not entered on the District Court's Docket until January 21, 2015. *Doc.* 114.

On March 4, 2013, before the Third Circuit dismissed Brooks' appeal, the remaining defendants named in the amended complaint filed a motion to dismiss and for summary judgment. *Doc.* 69. While the deadline for the remaining defendants to file a statement of material facts and brief in support of their motion was pending, *see Doc.* 71, Brooks filed his own motion for partial summary judgment, which is also partially a cross-motion (hereinafter referred to as Brooks' "motion for summary judgment"). *Doc.* 73. Along with his motion, Brooks filed exhibits and a supporting brief that contained within it a statement of material facts. *See Docs.* 75 & 75-1. Then, on April 11, 2013, the remaining defendants filed a statement of material facts in support of their dispositive motion along with exhibits. *Doc.* 86. Additionally, on the same date, the remaining defendants filed a comprehensive brief in support of their motion and a brief in opposition of Brooks' motion. *See Doc.* 87. Thereafter, Brooks filed a reply brief to his own

---

[4] The Court also ruled that Brooks' amended complaint superseded his original complaint as a matter of law and further denied his motion to have his original claims recalled. *Doc.* 50 at 8-9, 14.

motion, *Doc.* 95, a brief-in-opposition to the defendants' motion, *Doc.* 101, and a counterstatement of material facts, *Doc.* 102.  On June 20, 2013, the remaining defendants then filed their reply brief in support of their dispositve motion.  *Doc.* 106.  The motions are now ripe for disposition on the merits.[5]

---

[5]   In the midst of everything that occurred in this case leading up to the filing of this Report, the originally imposed discovery-related deadlines lapsed, *see Doc.* 15, and an amended case management order was never entered.  Despite the absence of an amended case management order, the parties continued litigating this case past the original deadlines.  In addition, other than the filing of a single motion to compel filed by Brooks, which was recently ruled upon (*Doc.* 117), the Court is unaware of any outstanding discovery disputes that may have arisen between the parties, and neither side has sought leave to engage in additional discovery prior to the Court's decision on the pending dispositive motions.  As such, in our Order denying Brooks' motion to compel, we noted that pursuant to Local Rule 26.4 the discovery period for Brooks should have officially closed on or about March 25, 2013.  *See Doc.* 117 at 7 n. 7.  We also noted, however, that, since Brooks was never put on official notice of that deadline *via* Court Order, the discovery period should not officially close until March 13, 2015 – the date our Order denying Brooks' motion to compel was decided.  *See id.*  With all of this in mind, we proceed to rule upon the two summary judgment motions as filed in that, where appropriate, we will consider evidence outside the pleadings.

## II.    Factual Statement.[6]

---

[6]      Consistent with the Summary Judgment legal standard, *infra,* we will construe the facts in favor of the nonmoving party. We also note that pursuant to Local Rule 56.1, the papers opposing a motion for summary judgment shall include "a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried." The same Local Rule further provides that "[s]tatements of material facts . . . in opposition to[] a motion shall include references to the parts of the record that support the statements."  M.D. Pa. L.R. 56.1; *see also* Fed.R.Civ.P. 56(c)(1)("A party asserting that a fact . . . is genuinely disputed must support the assertion by citing to [record evidence]."). Accordingly, where a non-movant fails to cite to record evidence in a counterstatement of material facts, a finding that the movant's statements of fact are undisputed shall result.  *See, e.g.*, *Bronson v. White*, NO. 1:05-CV-2150, 2007 WL 3033865, at *1 n. 1 (M.D.Pa. Oct. 15, 2007) ("Although Plaintiff has denied certain paragraphs of the Defendants' Statement of Material Undisputed Facts, he has not pointed to record evidence to support such denials. Therefore, pursuant to Local Rule 56.1, those material facts are deemed to be admitted."); *see also,* Fed.R.Civ.P. 56(e)(2).  Here, in responding to and denying a select portion of the defendants' statement of material facts, Brooks sometimes cites to record evidence.  Other times, when denying the defendants' statement of facts, Brooks utterly fails to direct the Court to record evidence.  Thus, under normal circumstances, we would be inclined to deem those plain denials as admissions. Brooks, though, handwrites the following at the end of his counterstatement of facts:  "I swear under the pain/penalty [sic] of perjury the foregoing is true and correct." *Doc.* 102 at 8.  In light of that statement, we will not automatically deem admitted those statements of fact provided by the defendants that Brooks plainly denies; instead, we will analyze Brooks' plain denials to determine whether they are premised upon his personal knowledge or belief, and construe them as forming part of an affidavit.  *See* Fed.R.Civ.P. 56(c)(4) and Commentary to 2010 Amendments; *see also, Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985)(treating verified complaint as an affidavit in opposition to a motion for summary judgment); *Colon v. Coughlin*, 58 F.3d 865, 872 (3d Cir. 1995)("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, providing that it meets the other requirements for an affidavit under [Rule 56(c)(4), formerly Rule 56(e)].").

### 1.  Recreation and Shower Privileges for SMU Inmates.

In accordance with Institution Supplement 5217.01A, SMU inmates confined to the SMU are to be provided with a minimum of three showers per week.  *Doc.* 86 at ¶ 1.  Inmates in the SMU are also to be provided with a minimum of five hours of recreation per week, which gives inmates the opportunity to recreate outside of their cells.  *Id.* at ¶¶ 2, 3.  The minimum limit for recreation, however, is not always followed.  *Doc.* 102 at ¶ 2.

With respect to recreation time, SMU inmates are required to be dressed and prepared for recreation once officers arrive at their cell door.  *Doc.* 86 at ¶¶ 5-6.  Because of the volume of inmates to manage, escorting officers will not wait for inmates to prepare for readiness to participate in recreation.  *Id.* at ¶ 7.  Indeed, inmates may be denied recreation for not being ready or being unprepared.  *Id.* at ¶ 4.  SMU inmates, however, are not given notice of recreation time, resulting in missed recreation.  *See Doc.* 102 at ¶ 6.  As well, SMU inmates may be denied recreation due to severe weather, poor cell sanitation, or any other violation of the Bureau of Prison's (the "BOP") rules and regulations interfering with the orderly running of a federal institution.  *Doc.* 86 at ¶ 4.  Inmates may also refuse to participate in recreation.  *Id.* at ¶ 8.  If Brooks did not participate in recreation on a given day, it would have been due to institutional security needs or because he refused recreation.  *Id.* at ¶ 9.

13

On April 14, 2011, with respect to Brooks' claim that he was denied recreation time, Kepner was working as D Block Officer #5. *Id.* at ¶ 10. Kepner would ultimately deny Brooks with recreation time even though he was fully dressed. *Doc.* 102 at 14. Kepner, however, does not have authority to access an inmate's administrative remedies and was not aware of Brooks' previously filed administrative remedies. *See Doc.* 86 at ¶¶ 14-15.

## 2. **Stolen and Damaged Personal Property.**

On March 24, 2011, Brooks was on a hunger strike in an attempt to separate from his cellmate. *Doc.* 86 at ¶ 16; *Doc.* 102 at ¶ 16. As a result, Brooks and his property were moved from G Block to D Block. *Doc.* 86 at ¶ 17. When Brooks was moved to D Block, Prutzman did not assist in escorting Brooks. *Doc.* 102 at ¶ 18. Additionally, the escorting officer had already searched Brooks' property before he arrived at the new prison block. *Id.*

According to Prutzman, however, while on a hunger strike, inmates are limited to the amount and type of property they may retain and are not permitted to have food items. *Doc.* 86 at ¶ 19. As such, Prutzman admits to having searched through Brooks' property, but only in search of food items. *Id.* at ¶ 20. Once the search was completed, Brooks' property – i.e., legal papers, photos, and letters - was given back to him. *Id.* at ¶ 21; *Doc.* 102 at ¶ 21. Other items, however, were missing. *See Doc.* 102 at ¶ 21. Moreover, although some of his property was

14

returned, it (the property) had been doused in a prayer oil Brooks possessed.  *See id*.  As well, upon returning some of Brooks' property to him, Prutzman stated, "Officer Rogers is a friend of mine."  *Id.*  Officer Rogers was one of the defendants Brooks had sued in a previous federal lawsuit.  *Id.*

In addition, inmates arriving at USP Lewisburg are provided with a "starter laundry bag," consisting primarily of a blanket, three sheets, and a roll of toilet paper.  *Doc.* 86 at ¶ 22.  Laundry services are offered to SMU inmates three times per week and toilet paper exchange is once per week.  *Id.* at ¶ 23.  At no time did Prutzman deny Brooks with sheets, blankets, clothes, or toilet paper.  *Id.* at ¶ 24.  Furthermore, Prutzman did not falsify information or issue "fake" confiscation forms.  *Id.* at ¶ 25.[7]

### 3.  Exposure to Chemical Agents.

Program Statement ("P.S.") 5566.06, <u>Use of Force and Application of Restraints</u>, provides guidance for the use of chemical agents or non-lethal weapons by BOP officials.  *Doc.* 86 at ¶ 28.  In accordance with P.S. 5566.06, the Warden may authorize the use of chemical agents or non-lethal weapons only when an inmate is armed and/or barricaded; or cannot be approached without danger to self or others; and, it is determined that a delay would constitute a serious hazard to the

---

[7]    Brooks points to a Personal Property Record that was supposedly drafted on the same date that he was transferred to D Block.  *See Doc.* 102 at ¶ 25.  Said Record, however, is unsigned and there is otherwise no identifying information on it to implicate Prutzman.  *See Doc.* 2-1 at 8.

inmate or others, or would result in a major disturbance or serious property damage. *Id.* at ¶ 29. According to Brooks, "the Warden" was never present to authorize the use of chemical agents. *Doc.* 102 at ¶ 29. Nevertheless, an "Acting Warden" authorized the use of chemical agents on the date specifically complained of by Brooks. *See generally, Doc.* 86-1 at 18-21.

When chemical munitions are utilized, the inmates who are "directly" involved in the incident are decontaminated and undergo a medical assessment. *Doc.* 86 at ¶ 30. On the other hand, inmates who are "indirectly affected" usually receive no treatment because they are minimally exposed to the chemical agents. *Id.* at ¶ 31.

On occasion, there have been inmates with respiratory ailments (i.e., asthma) who have been affected by the exposure to chemical agents. *Id.* at ¶ 32. In those infrequent cases, where the inmates display signs of difficulty breathing, they are removed from their cells and treated. *Id.* at ¶ 33. According to Brooks, he has had over 15 respiratory infections along with post-nasal drip and "phlegm-buildup." *Doc.* 102 at ¶ 34. Brooks' inmate medical records, however, show no documented respiratory problems or ailments. *See Doc.* 86-1 at 33-71 *thru Doc.* 86-3 at 64.

On February 6, 2011, chemical munitions were used on G Block: the prison block where Brooks was housed. *See Doc.* 86 at ¶ 35. According to Brooks, the chemical agents spread throughout the enclosed range and through the connecting

air vents.  *Doc.* 102 at ¶ 36.  Furthermore, Brooks, who needed assistance, was not treated or assessed by medical personnel at the Prison despite his pleas.  *Id.* at ¶¶ 37-38.  Thus, no medical records exist.  *See id.*

### 4.  The Altercation and Subsequent Medical Assessment.

As of March 1, 2013, Brooks had incurred 53 misconducts during his imprisonment.  *Doc.* 86 at ¶ 39.  Of those misconducts, 13 involved higher level infractions stemming from fights with other persons and included assault without serious injury, possession of a dangerous weapon, and threatening bodily injury.  *Id.* at ¶ 40.  Brooks also received misconducts for starting a fire, destroying property, and engaging in disruptive conduct.  *Id.*

On May 13, 2011, Kepner was working as D Block Officer # 5.  *Id.* at ¶ 41. In that position, Kepner was responsible for assisting the "floor officer" with escorting inmates to recreation.  *Id.* at ¶ 42.  Ordinarily, the "floor officer" has the authority to change recreation groups; a group composed of one to six inmates.  *Id.* at ¶¶ 43, 45.  Inmates, including Brooks, could also request to be placed in a specific recreation group.  *Id.* at ¶¶ 44, 48.  Before changing recreation group assignments, documentation must be reviewed in order to ensure that there are no existing concerns about grouping certain inmates together.  *See Doc.* 86 at ¶ 49. Furthermore, changing recreation group assignments is normally not a decision to be made by a single officer.  *See id.* at ¶ 50.  As well, a day or two is usually

needed before any reassignment or changes can be made to the recreational groups. *Id.* at ¶ 51. Brooks, however, has "witnessed officers switch [inmates] at the spur of the moment. . . ." *Doc.* 102 at ¶ 50; *accord id.* at ¶ 51.

While Kepner was not the "floor officer" on May 13, 2011, he may have had input into the composition of the recreation groups. *See Doc.* 86 at ¶ 46. Indeed, Brooks saw Kepner with the roster containing the recreation group assignments on this date. *See Doc.* 102 at ¶ 46. Additionally, by that date, Brooks had filed an administrative remedy against Kepner, albeit improperly, *see infra*, for having previously denied him with recreation. *See also, Doc.* 75 at ¶ 2. Thereafter, as Brooks was on his way to recreation, Brooks provides evidence that Kepner grinned at him and stated "[l]et's see how this works out." *See Doc.* 75-1 at 2, 11. Kepner disputes this, however. *See Doc.* 86 at ¶¶ 68, 69, 70. Subsequently, once Brooks was on his way into the recreation cage, he became involved in an altercation with another inmate. *Doc.* 86 at ¶ 52. According to Brooks, that inmate was never before part of his recreation group.

The altercation between Brooks and the other inmate was captured on video camera and was filed under seal as an exhibit in this case. *See Docs.* 118 & 119. The video, which contains no audio, reveals that as Brooks entered the recreation cage *via* the sally port, another inmate that was already inside of the recreation cage immediately charges at him. As the other inmate approaches Brooks, he

appears to have been trying to pin Brooks up against the cage inside of the sally port area. The other inmate also appears to attempt to throw a punch, but misses his intended target. At that moment, Brooks grapples with the other inmate and places said inmate into a headlock such that the inmate's face becomes buried into Brooks' chest. Brooks then proceeds to deliver a series of punches and blows to the back and side of the other inmate's head. The other inmate also swings at Brooks. *See also, Doc.* 86 at ¶ 58. Following the delivery of those punches, the two men continue grappling. As other corrections officers arrive at the recreational cage, Brooks shoves off the other inmate and closes the door to the sally port. Brooks is then placed back into hand restraints and escorted away from the recreation cage. In all, the two men fight for less than a minute. Again, Kepner and Crawley deny orchestrating an attack on Brooks or otherwise involving themselves with violating Brooks' rights. *See Doc.* 86 at ¶¶ 68, 69. Moreover, those defendants provide evidence demonstrating that neither Brooks nor the other inmate was assigned to "single" recreation status on that date. *Id.* at ¶ 66. If either of them were so assigned, they would not have been grouped together. *Id.* at ¶ 67.

During the altercation, the video also reveals that an individual, whom we presume to be Crawley, does not appear perplexed and does not open the sally port door while the altercation was ongoing. Crawley, however, immediately called for assistance when the altercation started. *Id.* at ¶ 59. Thereafter, the video shows

additional officers arriving at the recreation cage where the altercation is occurring. Once the altercation quickly ends, Crawley is seen opening the door leading outside of the sally port in order to have the two men separated.

With respect to injuries Brooks may have sustained, it remains disputed between the parties. *See Doc.* 75 at ¶¶ 4-5; *Doc.* 86 at ¶¶ 62, 63; *Doc.* 102 at ¶¶ 62-63. Brooks attests that his injuries stemming from the fight consisted of a bite on his chest in addition to bruises located on his face and torso. *Doc.* 102 at ¶ 63; *see also, Doc.* 75 at ¶¶ 4-5. Brooks also alleges generally that he had some soreness. *Id.* Moreover, Brooks attests that he was never medically assessed for said injuries. *Id.* Nevertheless, George, who was more recently identified by Brooks as a defendant, disputes that Brooks suffered any injuries, at least any significant ones, and also points to a medical record as evidence that he conducted some assessment on Brooks after the altercation. *See Doc.* 86 at ¶¶ 62-63.

### 5. The Disciplinary Proceedings Stemming from the May 2011 Altercation.

Following the altercation that had occurred on May 13, 2011, both inmates were issued incident reports for fighting, in violation of BOP Disciplinary Code 201. *Doc.* 86 at ¶ 71. In describing the incident, Crawley wrote:

20

"On the above date at approximately 8:00 a.m., I opened the sally port door. . . .   At this time, [Brooks] began fighting with [the other inmate].  [Brooks] was striking [the other inmate] with closed fist (sic) to the head and upper torso.  [The other inmate] was also striking [Brooks] with close fist (sic) to the head and upper torso."

*Id.* at ¶ 72.

On May 14, 2011, the Unit Discipline Committee ("UDC") conducted a hearing and ultimately referred the charge to Jordan for a further disciplinary hearing.  *See id.* at ¶ 73.  At the UDC hearing, Brooks stated his belief that Kepner had set him up to get in a fight with the other inmate.  *Id.* at ¶ 74.   His rights as an inmate, at a disciplinary hearing, were not discussed.  *Doc.* 102 at ¶ 75.  Moreover, Brooks was not presented with the form entitled "Notice of Discipline Hearing Before the DHO."  *Id.* at ¶ 76.

Despite not being presented with his rights, Brooks chose "Officer Robey" to be his staff representative at the disciplinary hearing before Jordan.  *Id.* at ¶ 79.  Officer Robey, however, declined to act as Brooks' staff representative.  *See Doc.* 86 at ¶ 80.   As such, Bledsoe assigned Cotterall to act as Brooks' staff representative, to which Cotterall agreed.  *Id.* at ¶¶ 81, 82.  Brooks, though, never met with Cotterall before his disciplinary hearing before Jordan, and he was not made aware of the change to his staff representative until the hearing was to be conducted.  *Doc.* 102 at ¶ 83.

21

At the disciplinary hearing conducted on July 28, 2011, Jordan officiated. *Doc.* 86 at ¶ 84. Cotterall was also present as Brooks' staff representative. *Id.* at ¶ 85. Cotterall, who reviewed pertinent documents and the video of the incident, stood by silent during the disciplinary hearing. *Id.* at ¶ 86; *Doc.* 102 at ¶¶ 85-86. Also, Brooks was not provided with his rights as an inmate for proceeding during the hearing. *Doc.* 102 at ¶ 87.

As the hearing proceeded, Brooks admitted to striking the other inmate in the head numerous times, but he testified that he was trying to defend himself against being bitten. *Doc.* 86 at ¶ 88. Moreover, other than complaining about his appointed staff representative, Brooks made no complaints of due process violations during the hearing. *Id.* at ¶ 89; *Doc.* 102 at ¶ 89. In addition, Inmate Nelson was not called to testify during the hearing due to security concerns because he (Nelson) was confined in an SMU separate from Brooks.[8] *Doc.* 86 at ¶ 90. Inmate Nelson also refused to make a written statement in lieu of live testimony. *Id.* at ¶ 91.[9] In the end, Jordan considered the evidence (including the lack of bite mark evidence presented at the hearing), credited Crawley's statement

---

[8] As far as we are aware, Inmate Nelson was not the same inmate involved in the altercation with Brooks.

[9] Brooks attempts to dispute this fact by pointing to an affidavit signed by inmate Nelson wherein he (i.e., inmate Nelson) affirms that he would have testified if called as a witness for Brooks. *See Doc.* 102 at ¶ 91. This affidavit (*Doc.* 32 at 6), however, does not stand for the proposition that Brooks submits: that inmate Nelson was not at all contacted about the disciplinary hearing.

in the incident report, and issued a written decision finding that Brooks had committed the prohibited act of fighting.   *See generally, id.* at ¶ 92-94. Consequently, Brooks was sanctioned to 30 days in disciplinary segregation and a loss of certain privileges for a four-month period. *See id.* at ¶ 95.  Brooks was also sanctioned with a 27-day loss of good conduct time credit, but he did not actually lose any time credit because he has none to lose since he is serving a life sentence. *Id.* at ¶ 96.  A loss of good conduct time credit is issued as a sanction for inmates sentenced to life imprisonment in the event that their sentence is commuted.  *Id.* at ¶ 97.  These sanctions have not been overturned or expunged, and Brooks was provided with a copy of Jordan's report on August 10, 2011.  *Id.* at ¶¶ 98-99. Nevertheless, on appeal, Brooks argued that he merely acted in self-defense.   In responding to and denying Brooks' appeal, Norwood informed him that self-defense is not a valid defense in disciplinary proceedings. *See Doc.* 75-1 at 9.

### 6.  Duress Buttons.

At USP Lewisburg, nearly all inmates are double-celled.  *Doc.* 86 at ¶ 105. While "staff" does not make frequent rounds, all housing units are staffed 24 hours per day for seven days per week.  *Id.* at ¶ 106; *Doc.* 102 at ¶ 106.   Furthermore,

only one housing unit at USP Lewisburg contains duress buttons.  *Doc.* 86 at ¶ 107.

### 7. Ladders, Storage Shelves, Lockers, Desks, Ventilation, and Visitation.

Each inmate at USP Lewisburg is provided with a sleeping surface and a mattress that is at least 12 inches off of the floor.  *Doc.* 86 at ¶ 108.  Ladders are not provided for security purposes; though, inmates who have a legitimate medical reason which prevents them from accessing an upper bunk bed can get a lower-bunk pass from the Health Services staff.  *Id.* at ¶¶ 112-13.  In addition, each cell contains one desk and chair that must be shared by the individuals living in the cell.  *Id.* at ¶ 111; *Doc.* 102 at ¶¶ 109-10.  Sometimes cellmates fight over usage of the single desk and chair.  *See Doc.* 102 at ¶ 111.

With respect to storage bins, lockers, and shelves for SMU inmates, they are not approved by the BOP.  *See Doc.* 86 at ¶ 114.  For storage purposes, SMU inmates are provided with a mesh (or net) bag, instead.  *Id.* at ¶ 115; *Doc.* 102 at ¶ 115.

At USP Lewisburg, specifically, there is only one housing unit with air conditioning.  *Doc.* 86 at ¶ 116.  Inmates in housing units at USP Lewisburg without air conditioning have access to windows that they can open for ventilation.  *Id.* at ¶ 117.  Large fans are also secured to the ceilings of those housing units

without air conditioning, albeit behind full length doors, in order to assist with the flow of air. *Id.* at ¶ 118; *Doc.* 102 at ¶ 118.

On July 21, 2011, Brooks was medically evaluated for dizziness after he had passed out. *Doc.* 86 at ¶ 119; *Doc.* 102 at ¶ 119. According to medical records, the heat index on that day reached 105 degrees. *Doc.* 86 at ¶ 120. Medical staff made no significant findings and informed Brooks of the need for him to increase his water intake. *Id.* at ¶ 121. Four days later, Brooks was medically evaluated for complaints of a heat rash, fungus in his toe nails, and for a medication refill. *Id.* at ¶ 122. Otherwise, the medical care provider found nothing significant about Brooks' health. *See Doc.* 102 at 11.

### 8. Visitation.

In accordance with Institution Supplement 5217.01A, <u>Special Management Units</u>, visitation privileges for inmates in the SMU program at Levels I and II are facilitated *via* video. *Doc.* 86-1 at 8-9, 13. Brooks, an inmate in the SMU program at USP Lewisburg, fell within one of those two Levels. *See generally, Doc.* 102 at ¶¶ 125-26. For inmates at Levels I or II, they must also submit a request in writing to their Unit Manager, at least one week in advance of the expected visit. *Doc.* 86-1 at 13. Moreover, since the availability of video equipment is limited, visitations *via* video are limited to one hour periods. *Id.* Furthermore, for inmates at Levels I, II, and III, inmates may only be visited by immediate family members. *Id.*

### 9.  Uniform Commercial Code ("UCC") Materials.

The Court Security Act of 2007, 18 U.S.C. § 1521, provides:

> Whoever files, attempts to file, or conspires to file, in any public record or in any private record which is generally available to the public, any false lien or encumbrance against the real or personal property of an individual described in [18 U.S.C. § 1114][10], on account of the performance of official duties by that individual, knowing or having reason to know that such lien or encumbrance is false or contains any materially false, fictitious, or fraudulent statement or representation, shall be fined under this title or imprisoned for not more than 10 years, or both.

Shortly after the passage of this Act, the BOP disseminated notices to the inmate population informing them that the UCC and lien related documents would be considered contraband and subject to confiscation.  *Doc.* 86 at ¶ 128.  Inmates were also informed that they were prohibited from obtaining or possessing any documents which contain unauthorized personal information, including, but not limited to, home addresses, telephone numbers, social security numbers, email or fax numbers of any jurors, witnesses, informants, or federal official, including but not limited to, BOP staff, United States Attorneys, Judges, and other federal agents.  *Id.* at ¶ 129.   As well, inmates were notified that if they were found in possession of this information, the items would be confiscated and they would be subject to inmate discipline or criminal prosecution or both.  *Id.* at ¶ 130.  Inmates nevertheless could appeal the confiscation of this information through the BOP's

---

[10]     Section 1114, in general, refers to individuals working for, or on behalf of, the United States Government.

administrative remedy process. *Id.* at ¶ 131. Consistent with these notices, Bledsoe posted a formal notice to the inmate population on January 29, 2009. *Id.* at ¶ 132. Brooks subsequently arrived at USP Lewisburg on November 29, 2010. *Id.* at ¶ 133.

### 10. Rejected Books, Photos, and Other Written Materials.

The BOP permits an inmate "to subscribe to or to receive publications without prior approval . . . except when precluded by statute." *Doc.* 86 at ¶ 136. Under BOP P.S. 5266.10, <u>Incoming Publications</u>, there are established procedures to determine if an incoming publication is detrimental to the security, discipline, or good order of the institution, or if it might facilitate criminal activity. *Doc.* 86-5 at 57-61. The Warden has authority to reject a publication for those reasons. *Id.* at 58. The term "publication," means "a book, booklet, pamphlet, or similar document, or a single issue of a magazine, periodical, newsletter, newspaper, plus such other materials addressed to a specific inmate such as advertising brochures, flyers, and catalogs." *Id.* at 56. The Warden, however, may not reject a publication solely because its content is sexual, or because its content is unpopular or repugnant. *Id.* at 58. Publications which may be rejected by the Warden for the aforementioned reasons include material that is sexually explicit, "which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity." *Id.* at 59. If such a publication contains

27

sexually explicit material, an Acting Warden may act in the Warden's place in rejecting such a publication. *Id.* The policy statement makes it clear that a publication not subject to the term "sexually explicit" as defined in the Ensign Amendment, *infra,* is nonetheless still subject to rejection by the Warden or Acting Warden. *See id.* Furthermore, in rejecting publications, the Warden shall review the individual publication prior to the rejection of that publication and may not rely upon the fact that several issues of a subscription publication have been rejected. *See id.* at 60. As well, the term "sexually explicit" in this instance does not include material of a news or information type; publications concerning research or opinions; scholarly publications; and literary publications. *Id.* at 59-60.

In addition, the same policy statement includes procedures on complying with the Ensign Amendment, originally enacted as part of the Omnibus Consolidated Appropriations Act of 1997, which prohibits the use of funds appropriated for the BOP to "distribute or make available any commercially published information or material to a prisoner [when] such information or material is sexually explicit in nature or features nudity." The Amendment has since been codified at 28 U.S.C. § 530C(b)(6). *Doc.* 86 at ¶ 140. Under this part of the program statement, "nudity" is defined as "a pictorial depiction where genitalia or female breasts are exposed." *Id.* at ¶ 142. P.S. 5266.10 further defines "features" to mean that the publication in question "contains depictions of nudity

or sexually explicit conduct on a routine or regular basis or promotes itself based upon such depictions in the case of individual one-time issues." *Id.* at ¶ 143. The definition of "features" further includes an exception for material that contains nudity "illustrative of medical, educational, or anthropological content." *Id.* at ¶ 144.

With respect to the definition of the phrase "sexually explicit," it is defined by the Ensign Amendment as a publication containing "a pictorial depiction of actual or simulated sexual acts including sexual intercourse, oral sex, or masturbation." *Id.* at ¶ 141. The policy, however, goes on to provide that: "[W]ritten text in [a] publication does not qualify a publication as sexually explicit." *Doc.* 86-5 at 64. As such, "[p]ublications with sexual content which are not returned under [the Ensign Amendment procedures] are still subject to rejection through the application of the procedures [previously described, *supra*]." *Id.* In other words, while not qualifying for rejection under the Ensign Amendment, a publication may nonetheless be rejected for being considered detrimental to the security and good order of the institution. *See id.*

Once a publication is rejected, the BOP regulations provide, "[w]hen commercially published information or material may not be distributed by staff or made available to inmates due to statutory restrictions, the Warden or designee shall return the information or material to the publisher or sender. The Warden or

29

designee shall advise the publisher or sender that an independent review of the decision may be obtained by writing to the Regional Director within 20 days or receipt of the notification letter.   Staff shall [further] provide the inmate with written notice of the action." *Doc.* 86 at ¶ 146.

In 2011, on February 18, July 1, and July 21, a total of three sexually explicit books were rejected by USP Lewisburg mailroom staff. *Id.* at ¶ 148.   In the same year, on February 22, July 6, and July 22, Young authorized the rejection of three publications mailed to Brooks that were sexually explicit in nature. *Id.* at ¶ 149. Among the books rejected were ones titled "Heidi's Bedtime Stories," "Velvet Nightmares, & Succulent" and "Pornoland." *See Doc.* 86-5 at 52-55.   Of the three books, the former ones contained sexually explicit photographs. *See id.* at 52. Additionally, on July 8 and 14, 2011, several sexually explicit personal photos were rejected by USP Lewisburg mailroom staff. *Id.* at ¶ 150.

### 11. Dr. Mink.

Mink recalls Brooks and two encounters that she had with him. *Doc.* 86 at ¶ 152.   Mink initially met Brooks on February 3, 2011, during a weekly, routine, psychology round consisting of a general discussion with an inmate about his or her welfare. *See id.* at ¶ 153, 153 n. 3.   On that occasion, Brooks complained about abnormal behavior occurring during his sleep cycle and requested a night light. *See id.* at ¶ 154, 154 n.4.   In response, Mink explained to Brooks that Psychology

Services at USP Lewisburg does not authorize the use of night lights.  *Id.* at ¶ 155.

Brooks agreed to accept self-help literature.  *Id.* at ¶ 156.

During the second encounter, on February 8, 2011, Brooks voiced no mental health concerns.  *Id.* at ¶¶ 157-58.  Brooks was also observed exercising and socializing with other inmates in the recreation area.  *Id.* at ¶ 158.  Mink and Brooks discussed his administrative remedies.  *See Doc.* 102 at ¶ 159.  At one point, during that discussion, Mink was overheard by other inmates saying, "[w]hat are you doing?  Let me see your hands.  Why don't you have any pants on?"  *See Doc.* 2-1 at 3-6.  Moreover, Mink was heard saying "[i]f you want to play these games, we can play, you and your whole [administrative remedy] crew."  *See id.*

### 12. Administrative Tort Claim Remedies.

Brooks has filed 14 administrative tort claim remedies, only three of which address the issues Brooks raises in his amended complaint.  *Doc.* 86 at ¶¶ 162-63.  In Administrative Tort Claim Remedy Number TRT-NER-2011-04508, Brooks sought compensatory damages in the amount of $3,000 for alleged property loss and damage sustained as a result of spilled prayer oil from when he was transferred from G Block to D Block on March 24, 2011.  *See Doc.* 86-4 at 34.  This remedy was denied.  *Id.*  In Administrative Tort Claim Remedy Number TRT-NER-2012-02385, Brooks sought compensatory damages in the amount of $12.85 for the rejection of his books on July 6, 2011.  *Doc.* 86 at ¶ 165.  This claim was denied.

*Id.* Finally, in Administrative Tort Claim Remedy Number TRT-NER-2011-04509, Brooks sought compensatory damages in the amount of $12,000 for an alleged personal injury that he suffered during recreation on May 13, 2011.  *Id.* at ¶ 166. As part of his evidence, in support of that particular remedy, Brooks complained that he had recreated with the same group of inmates for over one month without incident, but that Kepner had intentionally switched the groups.  *See id.* at ¶ 167. This administrative tort claim was also denied.  *Id.* at ¶ 168.

### 13. Other Administrative Remedies.

The BOP has established a multi-tier system whereby a federal inmate may "seek formal review of any aspect of . . . confinement."  *Doc.* 86 at ¶ 169; *see* 28 C.F.R. §§ 542.10-542.19.  Under that system, federal inmates must first informally present their complaints to staff "and staff shall attempt to informally resolve" any issues before an inmate files a formal request for administrative remedy.  *Doc.* 86 at ¶ 170.  An inmate has 20 calendar days "following the date on which the basis of the Request occurred" to complete informal resolution and to submit a formal written administrative remedy request.  *Id.* at ¶¶ 171, 173.  If an inmate can demonstrate "a valid reason for delay, an extension in filing time may be allowed." *Id.* at ¶ 172.  In the event that the inmate is dissatisfied with the Warden's response, the inmate may file an appeal to the Regional Director within 20 calendar days.  *Id.* at ¶ 174; *accord id.* at ¶ 174 n. 5.  If the inmate is dissatisfied

with the Regional Director's response, that decision may then be appealed to the Central Office within 30 calendar days from the date of the Regional Director's response. *Id.* at ¶ 175. No administrative remedy appeal is considered to have been fully exhausted until it has been decided by the BOP's Central Office. *Id.* at ¶ 176. If an inmate does not receive a response to his remedy within the time frame allotted in the regulations for reply, including extension, "the inmate may consider the absence of a response to be a denial at that level." *Id.* at ¶ 177. All administrative remedies, whether accepted or rejected, are entered into the BOP's computerized system of records. *Id.* at ¶ 178. Moreover, if a remedy is rejected, it is returned to the inmate and that inmate is provided with a written notice explaining the reason for rejection; however, the BOP does not retain copies of rejected administrative remedies. *Id.* at ¶¶ 179-80.

Between December 10, 2010, and February 21, 2012, Brooks filed approximately 134 administrative remedies. *Id.* at ¶ 181. In particular, Brooks attempted to exhaust his claim that he was denied recreation on April 14, 2011, by filing Administrative Remedy Number 639755-F1. *Id.* Said administrative remedy was received on May 18, 2011, and also complained of the May 13 altercation. *Id.* at ¶ 182. Given that the administrative remedy involved two separate issues, it was rejected. *Id.* at ¶ 183. Brooks nonetheless was informed that he could re-file an administrative remedy within 10 days of receiving formal

notice. *See id.* at ¶ 184.  Subsequently, on May 27, 2011, Brooks resubmitted the administrative remedy, Number 639755-F2, again alleging that he was denied recreation and involved in an altercation. *See id.* at ¶ 185.  On this occasion, Brooks alleged that both incidents occurred on April 14, 2011. *Id.* at ¶ 186.  In the end, this, second, administrative remedy was rejected as untimely on the date that it was filed. *Id.* at ¶ 187.

On June 15, 2011, Brooks filed an appeal of the rejection (Administrative Remedy ID 639755-R1) to the Regional Office. *Id.* at ¶ 188.  On June 20, 2011, the administrative remedy appeal was rejected for being untimely and it was noted in the rejection that the Regional Office staff concurred with the Warden's decision of untimeliness. *Id.* at ¶¶ 189-90.  Thereafter, on July 5, 2011, Brooks filed Administrative Remedy Appeal Number 639755-A1 at the Central Office Level, raising the same issues of denial of recreation and that he had been involved with an altercation. *Id.* at ¶ 191.  On July 19, 2011, this administrative remedy appeal was rejected by the Central Office for having been submitted at the wrong level and for not first exhausting the appeal process at the institutional and regional levels. *Id.* at ¶ 192.

## III.   **Legal Standards.**

The defendants have filed a motion to dismiss and for summary judgment. Brooks has filed his own motion for summary judgment. The legal standards for a motion to dismiss and for summary judgment follow.

## A. Motions to Dismiss.

The defendants move for dismissal pursuant to Rules 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure. "A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of the plaintiff's complaint." *Vieth v. Pennsylvania*, 188 F.Supp.2d 532, 537 (M.D. Pa. 2002) (quoting *Ballenger v. Applied Digital Solutions, Inc.*, 189 F.Supp.2d 196, 199 (D. Del. 2002)). When a motion under Rule 12 is based on more than one ground, the court should first consider the subject matter jurisdiction challenges because if it must dismiss claims for lack of subject matter jurisdiction, then all other defenses and objections become moot. *See In re Corestates Trust Fee Litig.*, 837 F.Supp. 104, 105 (E.D. Pa. 1993). When presented with a Rule 12(b)(1) motion, the plaintiff "will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006); *Kehr Packages v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991). Furthermore, there are two types of Rule 12(b)(1) motions. As such, a motion to dismiss under Rule 12(b)(1) may present either a facial or factual challenge to subject matter jurisdiction. *See Petruska*, 462 F.3d at 302 n. 3; *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549

F.2d 884, 891 (3d Cir. 1977); *see also Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n*, 227 F.3d 62, 69 (3d Cir. 2000).    A "facial attack" assumes that the allegations of the complaint are true, but contends that the pleadings fail to present an action within the court's jurisdiction. *Mortensen*, 549 F.2d at 891. The motion should only be granted if it appears with certainty that the court's assertion of jurisdiction would be improper. *Id.*; *Carpet Grp.*, 227 F.3d at 69.

The second form of a Rule 12(b)(1) motion is a "factual attack," which argues that, while the pleadings themselves facially establish jurisdiction, one or more of the factual allegations is untrue, thereby causing the matter to fall outside the court's jurisdiction. *Mortensen*, 549 F.2d at 891.  On a factual attack, the court must evaluate the merits of the disputed allegations, because "the trial court's ... very power to hear the case" is at issue. *Id.*; *Carpet Grp.*, 227 F.3d at 69; *Kenny*, 2009 U.S. Dist. LEXIS 8322 at *5–6, 2009 WL 276511 (citing *Berardi v. Swanson Mem'l Lodge No. 48 of Fraternal Order of Police*, 920 F.2d 198, 200 (3d Cir. 1990) ([I]n making its determination, the court is not confined to examining the face of the pleading, but may consider other evidence demonstrating the existence or lack of jurisdiction).

In short, on a facial attack, the allegations of the complaint are "taken as true." *Cohen v. Kurtzman*, 45 F.Supp.2d 423, 428 (D.N.J. 1999).   In a motion

attacking the factual existence of subject matter jurisdiction, however, "no presumptive truthfulness attaches to the allegations in the complaint." *Id.*

Additionally, the defendants contend that Brooks has not stated a claim upon which relief can be granted, as provided by Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Under Rule 12(b)(6), a district court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff is entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)). While a complaint need only contain "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), and detailed factual allegations are not required, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). "[L]abels and conclusions" are not enough, and a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.  Moreover, in a case such as this, a complaint filed by a *pro se* litigant is to be liberally construed and held to a less stringent standard than formal complaints drafted by a

37

lawyer. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Nevertheless, "*pro se* litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).

B. **Motions for Summary Judgment.**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The purpose of summary judgment is to avoid unnecessary trials in cases where the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).  Thus, the rule functions to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)(quoting Fed.R.Civ.P. 56(e) advisory committee's notes on 1963 amendments).  In doing so, "'a judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1886 (2014)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)); *see*

38

*Doe v. Luzerne County*, 660 F.3d 169, 175 (3d Cir. 2011)(A district court "'may not … weigh the evidence or make credibility determinations' because 'these tasks are left for the fact finder.'")(quoted case omitted).

From a procedural standpoint, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145–46 (3d Cir. 2004). If the moving party meets its burden with a properly supported motion, the burden then shifts to the non-moving party to present specific facts that show there is a genuine issue for trial. *Anderson*, 477 U.S. at 248.

A clear focus on where the burden of proof lies as to the factual issue in question is crucial. Depending on which party bears the burden, the party seeking summary judgment does not necessarily need to submit any evidence of its own. Thus, when the non-moving party would have the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the nonmovant's claim. *See, e.g., Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Rather, the moving party need only point to matters which demonstrate the absence of a genuine material factual issue. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)("[W]here the non-moving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and

admissions on file."). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element material to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322-23.

With respect to factual disputes, they are only material if they might affect the outcome of the suit under the applicable law, and they are genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49 (1986). Accordingly, a court should grant summary judgment where the nonmovant's evidence is merely colorable, conclusive, or speculative. *Id.* at 249–50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. *Id.* at 252; *see also Matsushita*, 475 U.S. at 586. As the Third Circuit has often stated, "summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *E.g., Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). Furthermore, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial. *Pamintuan v. Nanticoke Mem'l*

Case 3:12-cv-00067-JMM   Document 120   Filed 03/31/15   Page 41 of 96


*Hosp.*, 192 F.3d 378, 387 (3d Cir. 1999). But, again, in determining whether a factual dispute is genuine, the Court must focus on which party bears the burden of proof on the factual issue in dispute, because that party must produce sufficient evidence to support the factual claim. Moreover, in endeavoring to resolve a summary judgment motion, the Court must "consider all evidence in the light most favorable to the [non-moving party]." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007). This standard does not change where a cross-motion for summary judgment has been filed. *See Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) ("On cross-motions for summary judgment, the court construes facts and draws inferences 'in favor of the party against whom the motion under consideration is made.'")(quoting *Samuelson v. LaPorte Cmty. Sch.*, 526 F.3d 1046, 1051 (7th Cir. 2008)).

Last, in a case such as this, where events at issue have been captured on videotape, we are obliged to consider that videotaped evidence in determining whether there is any genuine dispute as to material facts. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (reversing court of appeals' ruling with respect to application of qualified immunity in an excessive force case, noting that the court erred by accepting a version of facts that was shown to be a "visible fiction" and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape.").

41

## IV.    **Discussion.**

### A. **"Officer Smith" and the "Unknown Defendants."**

In his amended complaint, as in his original complaint, Brooks also names "Officer Smith" and "Unknown Defendants." *See Doc.* 53.   To date, neither "Officer Smith" nor the "Unknown Defendants," have been served or properly identified despite the Court ordering Brooks to do so on or before January 25, 2013.  *Id.*  Brooks, instead, responded to our Order by filing an affidavit attesting that he had been transferred away from USP Lewisburg and has no means to discover the identities of "Officer Smith" and the "Unknown Defendants." *See Doc.* 66.  He also attested, however, that "Gregory George" was the health care provider who allegedly did not assess his injuries following the altercation Brooks had with another inmate.  *Id.*  Despite identifying "Gregory George," we will hold off on requiring the U.S. Marshal's Service to serve him pending the Court's resolution of the still-outstanding dispositive motions.   Furthermore, Brooks has not provided "good cause" for his failure to timely identify "Officer Smith" and the "Unknown Defendants," with the exception of George, to warrant an extension of time for the identification of, and service to, these defendants.   Brooks, instead, appears to have simply given up on his attempt to properly identify those individuals due to his prison transfer.  Accordingly, we recommend that "Officer Smith" and the "Unknown Defendants," other than George, be dismissed from this

lawsuit in accordance with Rule 4(m) of the Federal Rules of Civil Procedure. George, however, should be substituted and recognized as a defendant in this lawsuit moving forward.

### B. Brooks' Request for Injunctive Relief.

In his amended complaint, Brooks seeks an injunction "blocking the prohibition" of inmates from obtaining, possessing, or creating UCC and "plain nudity" materials at USP Lewisburg. *See Doc.* 38 at 6-7, 8. According to the defendants, Brooks' request for injunctive relief of this kind is moot since he is no longer imprisoned at USP Lewisburg and he cannot show a real or immediate threat that he would be wronged again. *Doc.* 87 at 9-10; *Doc.* 106 at 2. Brooks, however, contends that he has twice been to USP Lewisburg and that the injunctive relief he requests would operate as a suitable remedy in the event he is returned there to serve part of his sentence. *Doc.* 101 at 1.

In resolving this issue, it is well-recognized that the adjudicatory power of a federal court depends upon "the continuing existence of a live and acute controversy." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Id.* at 459 n. 10 (citations omitted). "Past exposure to illegal conduct is insufficient to sustain a present case or controversy regarding injunctive relief if unaccompanied by continuing, present adverse

effects." *Rosenberg v. Meese*, 622 F.Supp. 1451, 1462 (S.D.N.Y. 1985) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). Thus, a prisoner's transfer or release from prison moots his claims for injunctive or declaratory relief because he is no longer subject to the conditions he alleges are unconstitutional. *Sutton v. Rasheet*, 323 F.3d 236, 248 (3d Cir. 2003); *Abdul–Akbar v. Watson*, 4 F.3d 195, 206–07 (3d Cir. 1993).

Here, since the filing of his amended complaint, Brooks was transferred out of USP Lewisburg to another prison, USP Terre Haute, and he does not claim that his rights have been, or are being, violated there for the same or similar reasons. Moreover, there is nothing in the record to presently suggest that Brooks will indeed be returned to USP Lewisburg during the term of his imprisonment. Consequently, Brooks' claim for injunctive relief, relating to the ban on UCC and "plain nudity" materials at USP Lewisburg should be dismissed as moot. *See Fortes v. Harding*, 19 F.Supp.2d 323, 326 (M.D. Pa. 1998) ("Fortes' transfer to another institution moots any claims for injunctive or declaratory relief."); *Anderson v. Showalter*, No. 14-330, 2015 WL 1285957, at *7-*8 (M.D. Pa. Mar. 20, 2015)(dismissing state prisoner's request for declaratory relief as moot because he was no longer imprisoned at SCI Huntingdon and the claims solely related to alleged violations of law at that institution).  At the same time, we recognize that Brooks' transfer does not moot his claims for damages on this claim.  *See*

44

*Anderson,* 2015 WL 1285957 at *8 (citing *Muslim v. Frame*, 854 F.Supp. 1215, 1222 (E.D. Pa. 1994)).

### C. Brooks' *Bivens* Claims.

In *Bivens* the Supreme Court "recognized for the first time an implied private action for damages against federal [officials] alleged to have violated a citizen's constitutional rights." *Iqbal*, 556 U.S. at 675 (quoted case omitted); *see also, Butz v. Economou*, 438 U.S. 478, 504 (1978). "*Bivens* is analogous to its statutory cousin, 42 U.S.C. § 1983[11], which allows federal suits of state agents who commit civil rights violations while acting under color of state law." *Taylor v. Sanders*, No. 11-1291, 2012 WL 4104871, at *2 (M.D. Pa. Sept. 18, 2012); *see also, Argueta v. United States Immigration and Customs Enforcement*, 643 F.3d 60, 71 (3d Cir. 2011)("'In the limited settings where *Bivens* does apply, the

---

[11]     Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. *See* 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

*Id.*; *see also, Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002); *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

implied cause of action is the 'federal analog to suits brought against state officials under . . . [42 U.S.C.] § 1983.'")(quoting *Iqbal*, 556 U.S. at 676). "Thus, the required elements of a *Bivens* claim are (1) the conduct complained of was a person acting under color of law, and (2) the conduct deprived that person of a right, privilege, or immunity secured by the Constitution." *Taylor,* 2012 WL 4104871, at *2 (citing *Grohman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995)).

### 1. Sovereign Immunity.

Before delving into the substance of Brooks' *Bivens* claims, the defendants seek partial dismissal of them for lack of subject-matter jurisdiction, *via* the doctrine of sovereign immunity, to the extent Brooks aims his *Bivens* claims at the United States Government and the individual defendants, for money damages, in their official capacities. *Doc.* 87 at 10. In opposition, Brooks does not squarely address this issue; rather, he appears to mistakenly refer to the law on the doctrine of *qualified* immunity. *See Doc.* 101 at 1-2. Regardless, the law on this issue is straightforward and warrants dismissal for the reasons articulated by the defendants. As such, we do not go into detail in recommending partial dismissal, with prejudice, of Brooks' *Bivens* claims pursuant to the doctrine of sovereign immunity. *See Webb v. Desan*, 250 F.App'x 468, 471 (3d Cir. 2007)(concluding that the district court correctly dismissed with prejudice the plaintiff's *Bivens*

46

claims for damages, and stating that "[a]n action against prison officials in their official capacities constitutes an action against the United States and *Bivens* claims against the United States are barred by sovereign immunity, absent an explicit waiver. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 72 (2001); *F.D.I.C. v. Meyer*, 510 U.S. 471, 486 n. 11 (1994); *Jaffee v. United States*, 592 F.2d 712, 717 (3d Cir. 1979).").

## 2. Personal Involvement.

The remaining defendants -- Bledsoe, Crawley, Kepner, Mink, Prutzman, Jordan, Cotterall, and Young -- next argue that a portion of Brooks' *Bivens* claims should be dismissed for his failure to allege their personal involvement. *Doc.* 87 at 11-13. Indeed, claims brought pursuant to *Bivens*, like claims brought under 42 U.S.C. § 1983, cannot be imposed upon an official under a theory of *respondeat superior*. *See Iqbal*, 556 U.S. at 676 (stating, "[respondent] correctly concedes that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "[A] plaintiff must [, instead,] plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.*; *see also, Argueta*, 643 F.3d at 71 ("[A] government official is liable only for his or her own conduct and accordingly must have had some sort of personal involvement in the alleged

unconstitutional conduct."). Only in certain circumstances may a federal officer be liable in a supervisory capacity though he or she did not directly participate in the underlying constitutional conduct. *See Argueta*, 643 F.3d at 72. To that end, "[p]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.* (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) and omitting other cited cases). Furthermore, "[i]t is also possible to establish [*Bivens*-based] supervisory liability by showing [that] a supervisor tolerated past or ongoing misbehavior." *Id.* (quoting *Baker v. Monroe Township*, 50 F.3d 1186, 1191 n. 3 (3d Cir. 1995). Finally, a supervisory official may be liable under *Bivens* "if he or she implements a policy or practice that creates an unreasonable risk of a constitutional violation on the part of the subordinate and the supervisor's failure to change the policy or employ the corrective practices      . . . ." *Id.* (citing *Brown v. Muhlenberg Township*, 269 F.3d 205, 216 (3d Cir. 2001)).

The remaining defendants correctly point out that, in his amended complaint, Brooks does not allege any personal involvement on their part with respect to his claims that he was (1) sent to recreation in an ice covered cage (*Doc.* 38 at ¶¶ 2, 19); (2) denied sheets, blankets, and toilet paper (*see id.* at ¶ 4); (3) exposed to tear gas on February 16, 2011, with the fans intentionally turned off (*id.* at ¶ 5); (4) denied medical attention on February 16, 2011, when tear gas was

deployed (*see id.*); (5) denied a shower on April 1, 2011 (*id.* at ¶ 6); (6) double celled in a small cell with incompatible cellmates and no room to exercise, and retained in shackles for a lengthy period of time (*see id.* at ¶ 8); (7) subjected to conditions of confinement to include the lack of duress buttons, ladders to access the top bunk bed, storage room for personal belongings, or multiple desks upon which the cellmates could each have a place to sit and eat (*see id.* at ¶¶ 9-10); (8) placed in the SMU at USP Lewisburg on prison blocks with inadequate ventilation and limited showers (*see id.* at ¶ 11); and (9) denied certain visitation privileges as an inmate placed in the SMU program at USP Lewisburg (*see id.* at ¶ 12).[12]

To prevent dismissal of those particular claims, as to the remaining defendants, Brooks for the first time submits in part that Bledsoe authorized staff to arbitrarily employ chemical agents outside of his presence and that both Bledsoe and Young authorized the double celling of inmates in small cells without duress buttons, ladders, storage space, and more than one desk. *See Doc.* 101 at 2. In addition, Brooks contends that Young and Brooks authorized the inadequate ventilation of the prison blocks to which Brooks was assigned at USP Lewisburg. *See id.* at 3. Last, Brooks contends that the defendants cannot claim to be (or have

---

[12]   With respect to Brooks' claim that he was not provided medical assistance after the May 13, 2011, altercation, we do not recommend that said claim be dismissed for his failure to show personal involvement on part of the remaining defendants. As already mentioned, *supra,* Brooks has since identified George as the defendant to be substituted for that particular claim, and we address the claim on the merits, *infra*.

49

been) unaware of the problems stemming from the claims he raises in his amended complaint in light of the reasoning for the SMU program. *See id.* at 2-3.

Brooks' arguments, however, fail to convince us that he has sufficiently alleged personal involvement on part of the remaining defendants as to the aforementioned claims. In fact, Brooks does not point to any paragraph in his amended complaint where he has provided allegations that could be liberally construed to show personal involvement on part of the remaining defendants as to those particular claims. In addition, as the defendants point out in their reply brief, *Doc.* 106 at 3, "it is axiomatic that [a] complant may not be amended by the briefs in opposition to a motion to dismiss." *Commonwealth of Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)(quoted case omitted). By coming forward at this stage of the case to argue that Young and Bledsoe actually authorized or oversaw some, if not all, of these issues he complaints about is too late in the process and does exactly what the court in *Zimmerman* sought to preclude litigants from doing.[13] Accordingly, moving forward in this Report, we will not address these claims separately or as part of Brooks' retaliation claims, for he has not sufficiently alleged that any of the remaining defendants had personal involvement with these alleged acts.

---

[13] We also note that the Court has already ruled that Bledsoe solely remains in this case in relation to Brooks' claim that the policy banning inmates from possessing or obtaining UCC and "plain nudity" materials at USP Lewisburg is unconstitutional. *See Doc.* 50 at 16.

### 3.  Exhaustion of Administrative Remedies.

Kepner contends that Brooks' claim about being denied recreation on April 14, 2011, should be dismissed for his (i.e., Brooks') failure to exhaust administrative remedies.  *Doc.* 87 at 13-14.  In 1996, Congress enacted the Prisoner Litigation Reform Act (the "PLRA").  In pertinent part, the PLRA contains a mandatory exhaustion provision that "is a non-jurisdictional prerequisite," meaning that "exhaustion is a threshold issue for courts to address to determine whether litigation is being conducted in the right forum at the right time."  *Small v. Camden County*, 728 F.3d 265, 269, 270 (3d Cir. 2013)(internal quotations and quoted case omitted); *accord id.* at 269 n.3.  Moreover, the PLRA's exhaustion requirement applies equally to *Bivens* lawsuits as it does to lawsuits brought under 42 U.S.C. § 1983.  *See Nyhuis v. Reno*, 204 F.3d 65, 68-69 (3d Cir. 2000).

The exhaustion requirement of the PLRA reads:

> No action shall be brought with respect to prison conditions under [42 U.S.C. §] 1983, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  Since its enactment, the Supreme Court has consistently explained the purpose of the exhaustion requirement as follows:

> Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and

51

opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. In other instances, the internal review might "filter out some frivolous claims." And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.

*Porter v. Nussle*, 534 U.S. 516, 524-25 (2002); *see Jones v. Bock*, 549 U.S. 199, 219 (2007) (summarizing the purpose of the exhaustion requirement).

When a prisoner-plaintiff has not "properly" exhausted his or her administrative remedies, a defendant may raise non-exhaustion as an affirmative defense. In other words, exhaustion is not a pleading requirement for the prisoner-plaintiff. *Jones*, 549 U.S. at 212, 216–17 (2007); *see Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002) (holding that failure to exhaust is an affirmative defense and finding that the district court erred in imposing an improperly heightened pleading standard that required the prisoner not only to plead, but also to prove, exhaustion in the complaint). Here, the remaining defendants have not answered Brooks' amended complaint; rather, they filed the pending motion under review after Brooks had filed his amended complaint. In the dispositve motion filed by the remaining defendants, however, Kepner raises the affirmative defense of non-exhaustion. *See Doc.* 87 at 13-14.

Having raised the affirmative defense of non-exhaustion, Kepner maintains the burden of proving that Brooks did not "properly" exhaust administrative

52

remedies for his claim that he was denied recreation on April 14, 2011. *See Small*, 728 F.3d at 268-69 (3d Cir. 2013)(stating that failure to exhaust is an affirmative defense that the defendant must plead and prove)(citing *Jones*, 549 U.S. at 212). In order to prove that Brooks failed to exhaust, or procedurally defaulted, his federal claim stemming from April 14, 2011, Kepner must show that Brooks did not "'complete the administrative review process in accordance with the applicable procedural rules,' rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218 (citation omitted) (quoting *Woodford v. Ngo,* 548 U.S. 81, 88 (2007)). Moreover, "to complete the [prison grievance] process" means "substantial" compliance with the prison's grievance procedures. *Small* 728 F.3d at 272 (citing *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004)).[14]  Since Kepner has already detailed the BOP's prison grievance (or administrative remedy) procedure in his statement of facts, *supra,* we will not belabor them here.

The undisputed facts demonstrate that Brooks attempted to exhaust his claim that he was denied recreation on April 14, 2011, by filing Administrative Remedy Number 639755-F1.  Said administrative remedy was received on May 18, 2011, and also complained of the May 13 altercation. *Doc.* 86 at ¶ 182; *see Doc.* 86-5 at

---

[14]     Importantly, there is no "total exhaustion" rule permitting dismissal of an entire action because of one unexhausted, or procedurally defaulted, claim. *Jones*, 549 U.S. at 220–24.

9.  Because the administrative remedy raised two issues, it was rejected.  *Doc.* 86 at ¶ 183; *Doc.* 86-5 at 9.  Brooks nonetheless was informed that he could re-file a proper administrative remedy within 10 days of receiving notice of the rejection. *See id.* at ¶ 184.  Subsequently, on May 27, 2011, Brooks submitted administrative remedy number 639755-F2, again alleging that he was denied recreation and involved in an altercation.  *See id.* at ¶ 185.  On this occasion, Brooks alleged that both incidents occurred on April 14, 2011.  *See id.* at ¶ 186.  This time, the second administrative remedy was rejected as untimely on the date that it was filed.  *Id.* at ¶ 187.

On June 15, 2011, Brooks filed an appeal of the rejection (Administrative Remedy ID 639755-R1) to the Regional Office.  *Id.* at ¶ 188.  On June 20, 2011, the administrative remedy appeal was rejected for being untimely and it was noted in the rejection that the Regional Office staff concurred with the Warden's decision of untimeliness.  *Id.* at ¶¶ 189-90.  Thereafter, on July 5, 2011, Brooks filed Administrative Remedy Appeal Number 639755-A1 at the Central Office Level, raising the same issues of denial of recreation and that he had been involved with an altercation.  *Id.* at ¶ 191.  On July 19, 2011, this administrative remedy appeal was rejected by the Central Office for having been submitted at the wrong level and for not first exhausting the appeal process at the institutional and regional levels.  *Id.* at ¶ 192.

Upon these undisputed facts, coupled with the BOP's administrative remedy process and the law on exhaustion, we have little doubt that Brooks' claim against Kepner, relating to the denial of recreation on April 14, 2011, should be dismissed for non-exhaustion. Brooks nonetheless argues that the exhaustion requirement should be excused because his administrative remedy was made untimely by his correctional counselor who waited until after the deadline lapsed to provide him with the informal resolution form needed before proceeding to the formal administrative-remedy process. *See Doc.* 101 at 3. Brooks, though, fails to cite to any evidence in the record supporting that contention. Additionally, there is no evidence that Brooks, who has filed well-over 100 administrative remedies, sought an extension of time to file his administrative remedy relating to this particular issue, as the process permits. Therefore, Brooks' claim that Kepner denied recreation to him on April 14, 2011, should be dismissed for non-exhaustion.

### 4. Brooks' Still-Surviving *Bivens* Claims.

At the beginning of his amended complaint, Brooks avers that he has been retaliated against by staff at USP Lewisburg because he had previously filed a civil lawsuit against other staff members at USP Lewisburg, in which he ultimately prevailed, and because of more recent administrative remedies that he had filed. *See Doc.* 38 at ¶ 1. Thereafter, in his pleading, Brooks sets forth several examples of alleged retaliatory conduct. In liberally construing his pleading, we understand

that Brooks also raises standalone constitutional claims.  The defendants also appear to construe Brooks' amended complaint in the same manner.  As such, we will address each standalone claim before turning to the retaliation aspect of this lawsuit.


### a.  Mink's "False Accusations."

In his amended complaint, Brooks alleges that while he was in the midst of discussing an administrative remedy he had filed, "in regards to psychology turning a blind eye towards the negative psychological effects on the SMU program and its application," Mink loudly, and "falsely," accused him of fondling his penis while wearing no pants.  *Doc.* 38 at ¶ 3.  According to Brooks, this drew the unwanted attention from inmates in the vicinity, including his cellmate at the time.  The attention was unwanted because, according to Brooks, there is a "foul stigma" among the prison population against those who "masturbate to female staff."  *Id.*  As well, Brooks claims that her accusation could have resulted in an incident report and "still follows [him]."  *Id.*  Mink also allegedly told Brooks: "If you want to play these games, we can play, you and [your group of inmates who filed administrative remedies about the psychology department]."  *Id.*

During the discovery stages, the following evidence, viewed in the light

most favorable to Brooks, was revealed:   On February 8, 2011, Mink observed Brooks exercising and socializing with other inmates in the recreation area.  *Doc.* 86 at ¶ 158.  Mink and Brooks ended up discussing his administrative remedies. *See Doc.* 102 at ¶ 159.  At one point, during that discussion, Mink was overheard by other inmates saying, "[w]hat are you doing?  Let me see your hands.  Why don't you have any pants on?"  *See Doc.* 2-1 at 3-6.  Moreover, Mink was heard saying "[i]f you want to play these games, we can play, you and your whole [administrative remedy] crew."  *See id.*

Here, in the absence of any allegations (or evidence) of an injury suffered as a result of Mink's accusation, we simply fail to see how the accusation alone is sufficiently adverse to give rise to a violation of constitutional dimension.  *See generally, Robinson v. Taylor*, 204 F. App'x 155, 156 (3d Cir. 2006)(per curiam)(affirming the district court's ruling that the plaintiff failed to state an Eighth Amendment violation against the defendant who verbally abused and harassed him, where plaintiff did not allege that the remarks or harassment were coupled with actual physical injury); *see also, Maclean v. Secor*, 876 F.Supp. 695, 699 (E.D. Pa. Feb. 14, 1995)("A constitutional claim based only on verbal threats will fail . . . whether it is asserted under the Eighth Amendment[] . . . or under the Fifth Amendment[].").  Brooks does not convince us otherwise; rather, he inserts a new layer to the claim by plainly averring in his brief-in-opposition that Mink's

57

accusation resulted in "strife" between himself and other prisoners on his block that culminated in him going on a week-long hunger strike. *See Doc.* 101 at 4.  As before, Brooks cannot now add to his claims through his brief in opposition. While he alleged in the amended complaint that Mink's actions led to strife with other prisoners and "still follows [him]," he never before mentioned that he ended up going on a hunger-strike stemming from this particular incident.  Moreover, Brooks never defines or provides evidence of the "strife" he had with other prisoners, much less explain how her accusation still follows him.  Accordingly, this claim against Mink should be dismissed or, alternatively, judgment should be entered in Mink's favor.

### b.  Brooks' Personal Property.

According to Brooks, Prutzman stole and damaged some of his personal property.  As such, we construe his amended complaint, just as Prutzman does, *see Doc.* 87 at 18-19, to include a Fifth Amendment due process claim.

The Fifth Amendment, in part, provides that no person shall be deprived of property without due process of law.  U.S. CONST. Amend V.   Due process claims for negligent deprivations or destruction of property by prison officials are barred by *Daniels v. Williams*, 474 U.S. 327, 328 (1986).  "As to any alleged intentional deprivations [or destruction] of  property, [Brooks] had adequate post-deprivation remedies - the [BOP's] administrative remedy program and administrative claims

procedure - and the record indicates that he had notice and took advantage of these remedies." *Toney v. Sassaman*, 588 F. App'x 108, 110 (3d Cir. 2015); *see also, Doc.* 86-4 at 34.   As such, Brooks' claims for intentional deprivations against Prutzman must fail. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 421–22 (3d Cir. 2000).   Accordingly, judgment should be entered in Prutzman's favor on this claim.

### c. Medical Assessment after the Altercation on May 13, 2011.[15]

According to Brooks, after the altercation he had with the other inmate on May 13, 2011, George did not assess his injuries.  Brooks attests that his injuries stemming from the fight consisted of a bite on his chest in addition to bruises located on his face and torso.  *Doc.* 102 at ¶ 63; *see also, Doc.* 75 at ¶¶ 4-5. Moreover, Brooks attests that he was never assessed for said injuries.  *Id.* Nevertheless, George disputes that Brooks suffered any injuries, at least any significant ones, and also points to a medical record as evidence that he conducted some assessment on Brooks after the altercation.  *See Doc.* 86 at ¶¶ 62-63.

The Eighth Amendment, in pertinent part, guarantees the right to be free from cruel and unusual punishment inflicted by the Government.  *See* U.S. CONST.

---

[15]   To the extent Brooks raises a retaliation claim against George for this same event, *see Doc.* 38 at ¶ 7; *Doc.* 101 at 12, we find and recommend that the claim be dismissed because Brooks fails to plausibly show or demonstrate that a motivating or substantial reason for the alleged denial of a medical assessment was tied to any constitutionally protected conduct in which he was engaged.

Amend VIII. "The primary concern of the drafters [of the Eighth Amendment] was to proscribe 'torture(s)' and other 'barbar(ous)' methods of punishment." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).   In the Twentieth Century, however, the Supreme Court held that the Amendment proscribes more than physically barbarous punishments "embod[ying] 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency…,' against which [federal courts] must evaluate penal measures." *Id* (citations omitted).   Thus, the Supreme Court has since held repugnant to the Eighth Amendment "punishments which are incompatible with the evolving standards of decency that mark the progress of a maturing society … or which involve the unnecessary and wanton infliction of pain." *Id.* (quoted cases omitted).

In light of these elementary principles, claims raised under the Eighth Amendment are generally said to include an objective and subjective component. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *but see Brooks v. Kyle*, 204 F.3d 104, 108 (3d Cir. 2000)(explaining that in the excessive force context there is no objective component). The objective component is normally contextual and responsive to "contemporary standards of decency." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The subjective component on the other hand follows from the principle that "'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting

*Wilson*, 501 U.S. at 297); *Rhodes v. Chapman*, 452 U.S. 337, 345 (1981). What is necessary to establish an unnecessary and wanton infliction of pain varies according to the nature of the Eighth Amendment claim. *Hudson*, 503 U.S. at 5.

These elementary principles of the Eighth Amendment also operate to "establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. 103. This is especially true given that "[a]n inmate must rely on prison authorities to treat his medical needs…." *Id.* Moreover, "[i]n the worst cases, such a failure may actually produce physical 'torture or lingering death,' … the evils of most immediate concern to the drafters of the Eighth Amendment. [And, in] less serious cases, denial of medical care may result in pain and suffering which … would [not] serve any peneological purpose." *Id.* Thus, the Supreme Court has provided:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' … proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Id.* at 104.

Accordingly, to succeed on an Eighth Amendment claim a plaintiff must demonstrate "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cnty.*

*Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). To satisfy the first element, a medical need is generally considered "serious" where it "has been diagnosed by a physician as requiring treatment or is ... so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citations omitted).

Here, Brooks' claim should be dismissed. As an initial matter, Brooks does not provide sufficient allegations regarding his injuries in his amended complaint. Indeed, at no point in his amended complaint does he explain what injuries he incurred so as to make out an inadequate medical care claim under the Eighth Amendment. *See Doc.* 38 at ¶ 7. Furthermore, Brooks does not even allege that his alleged injures were serious. *Id.* In addition, assuming that it was undisputed that Brooks sustained bruises and a bite mark from the fight, there is nothing else in the record to demonstrate that said injuries were serious, requiring medical treatment. Indeed, Brooks provides no description of those injuries beyond a general description. *See Holmes v. Algarin*, No. 12-6245, 2013 WL 4763863, at * (E.D. Pa. Sept. 4, 2013)("[Plaintiff's] general complaints of head, neck and back pain do not rise to the level of a serious medical need, while his complaint of a bite lacks any stated facts regarding the nature of the bite, such as if the bite broke the skin, whether there was any blood, or if the bite looked infected. Thus, as currently pleaded, [plaintiff's] allegations of head, neck and back pain and a bite do not state

a serious medical need."). As such, we recommend that Brooks' Eighth Amendment medical care claim against George be dismissed or otherwise that judgment be granted in George's favor.

### d. Claims Stemming from the Disciplinary Hearing.

Regarding the disciplinary hearing that took place following the altercation on May 13, 2011, Brooks claims that Crawley lied in the incident report; Jordan colluded with staff to find him guilty of fighting by lying about his witness refusing to make a statement and switching his staff representative at the hearing; Cotterall, the appointed staff representative, did not speak up for him; and he was denied the ability to rely upon a theory of self-defense as a justification for fighting. *Doc.* 38 at ¶ 7. We construe each of these claims as arising under the due process clause. In the end, Brooks was found guilty of fighting and punished with, *inter alia*, a loss of good-conduct-time-credit and disciplinary segregation. To date, neither the charge nor the punishments have been reversed, expunged, or declared invalid.

In *Heck v. Humphrey*, 512 U.S. 477, 483 (1994), the Supreme Court confirmed that a prisoner's claim for damages that calls into question the lawfulness of his conviction or confinement is not cognizable under § 1983. The Court held that "when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily

imply the invalidity of his conviction or sentence." *Id.* at 487.  If it would, the complaint must be dismissed unless the plaintiff "can demonstrate that the conviction or sentence has already been invalidated." *Id.*

After *Heck*, the Supreme Court addressed the related issue of "whether a claim for damages and declaratory relief brought by a state prisoner challenging the validity of the procedures used to deprive him of good-time credits is cognizable under § 1983." *Edwards v. Balisok*, 520 U.S. 641, 643 (1997).   In that case, the inmate argued that he was denied the opportunity to put on a defense through specifically identified witnesses who possessed exculpatory evidence and that the alleged procedural errors resulted from "deceit and bias on part of the decision maker." *Id.* at 646-47; *accord id.* at 649 (Ginsburg, J., concurring).   In reaching its holding, the Court acknowledged that it was "clearly established in our case law" that a plaintiff is entitled to nominal damages in an action brought pursuant to 42 U.S.C. § 1983 where the plaintiff proves "that the procedures were wrong" but "not necessarily that the result was." *Id.* at 645 (citing *Carey v. Piphus*, 435 U.S. 247, 266 (1978)).   The Court, however, held that in cases where "the nature of the challenge to the procedures could be such as to necessarily imply the invalidity of the judgment," a claim for monetary damages or declaratory relief is not cognizable under § 1983. *Id.*   Thus, the inmate's claims in *Edwards* were not cognizable under § 1983 because the serious procedural defects of which he

complained "would, if established, necessarily imply the invalidity of the deprivation of his good-time credits." *Id.* at 646.[16]

Each of Brooks' claims in this instance, arising out of the disciplinary hearing where he was found guilty of fighting, would necessarily imply the invalidity of the conviction from the disciplinary hearing. Indeed, the very nature of Brooks' challenges to the procedures utilized and the evidence produced, squarely implies the invalidity of the result. This is true even with respect to Brooks' claim that he was unable to rely upon the self-defense justification to defend against the fighting charges. *See Abdul-Mateen v. Martin*, 20 F. App'x

---

[16]   "The *Heck* and *Balisok* rulings have been held applicable in *Bivens* proceedings. . . ." *Ford v. Bureau of Prisons*, No. 12-0873, 2013 WL 5603587, at *12 n. 9 (M.D. Pa. Oct. 11, 2013)(Nealon, J.)(citing *Clemente v. Allen*, 120 F.3d 703, 705 (7th Cir. 1997)).   Furthermore, the Third Circuit has held that the favorable-termination rule announced in *Heck*, and extended in *Balisok*, does not apply to claims that implicate only the conditions, not the fact or duration, of a prisoner's imprisonment.  *Torres v. Fauver*, 292 F.3d 141, 143, 148-50 (3d Cir. 2002).   Here, however, Brooks' claims relate to the fact or duration of his sentence in that he was not only sanctioned with time to serve in disciplinary segregation, stemming from the altercation, but he was also sanctioned with loss of good-conduct-time-credit that could have an impact on the duration of his life sentence, in the event that his sentence is commuted, *see Doc.* 86 at ¶¶ 96-97, which, to us, is sufficient to warrant application of the rule announced in *Heck* and extended in *Balisok*.  *But see, Hall v. Koehn*, No. 10-1172, 2011 WL 2265781, at *4-*5 (M.D. Pa. June 7, 2011)(reaching the opposite result in reliance on the language contained in 18 U.S.C. § 3624(b)(1)).   We also doubt whether Brooks could succeed on the merits of these due process claims in light of *Sandin v. Conner*, which held that a prisoner is deprived of a state-created liberty interest if the deprivation "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  515 U.S. 472, 484 (1995).

286, 287 (6th Cir. 2001)("[plaintiff's claim], that [the defendant] did not allow [him] to present a defense . . . during the misconduct hearing, would implicate the validity of [the] disciplinary conviction and is not cognizable under [42 U.S.C.] § 1983."). To that end, we also recognize that Jordan considered and rejected Brooks' statement that he was acting in self-defense, *see Doc.* 86-3 at 70, and, on appeal, Norwood informed Brooks that that the self-defense justification is not recognized in disciplinary proceedings. *See Doc.* 75-1 at 9. Therefore, to rule favorably on Brooks' claim in this case, that he was denied due process in that he could not present a self-defense justification, would certainly impact the validity of his disciplinary hearing conviction. Furthermore, Brooks' claims implying bias by Jordan are no different than the claims raised by the inmate in *Edwards.* Accordingly, each of these claims that Brooks raises should be dismissed.

### e. The Ban on UCC-Related Materials.

Here, Brooks alleges that Bledsoe adopted a policy of prohibiting inmates from obtaining, possessing, or creating UCC-related material, in violation of the First Amendment. *See Doc.* 38 at ¶ 13. Brooks, however, does not provide allegations to plausibly suggest that he was impacted (i.e., injured) by the policy; rather, he just avers that the policy is (or was) unconstitutional. In light of Brooks' failure to show how the policy, as applied to him, is unconstitutional, we do not hesitate to recommend that the claim be dismissed for his failure to state a

66

plausible claim for relief.  Even were we to accept his position set forth in his brief in opposition, *Doc.* 101 at 10, -- a position not alluded to in his amended complaint -- wherein he explains that the ban is overbroad to the extent that inmates such as him are precluded from certain legal resources because of their reference to the UCC, his claim should fail as a matter of law.

Although "imprisonment does not automatically deprive a prisoner of ... [First Amendment] protections," those constitutional protections may at times be restricted within the prison setting. *Beard v. Banks*, 548 U.S. 521 (2006).  To evaluate whether prison regulations violate an inmate's First Amendment right to possess publications or legal materials, we must employ the "reasonableness" test set forth in *Turner v. Safley*, 482 U.S. 78 (1987).

First, we must assess whether there is a "'valid, rational connection' between the prison regulation and the legitimate interest put forth to justify it.  Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Jones v. Brown*, 461 F.3d 353, 360 (3d Cir. 2006).  Second, if a rational relationship exists, we next consider three other factors: "(1) whether inmates retain alternative means of exercising the circumscribed right ... (2) the burden on prison resources that would be imposed by accommodating the right and (3) whether there are alternatives to the regulation that fully accommodate [ ] the

prisoner's rights at *de minimis* cost to valid penological objectives." *Id.* at 360–61.

However, prison administrators are not required to use the least restrictive means

possible to further legitimate penological interests. *See Thornburgh v. Abbott,* 490

U.S. 401, 411 (1989).   Provided with this test it is clear that "[the] first factor

'looms especially large because it tends to encompass the remaining factors, and

some of its criteria are apparently necessary conditions.'"   *Ramirez v. Pugh*, 486

F.Supp.2d 421, 427 (M.D. Pa. 2007)(McClure, J.)(quoting *Waterman v. Farmer*,

183 F.3d 208, 214 (3d Cir. 1999)).

Ultimately, the party challenging the prison regulation or policy bears the

burden of showing that it is constitutionally unreasonable. *Overton v. Bazzetta*, 539

U.S. 126, 132 (2003).   This burden is "heavy" because plaintiffs must overcome

the presumption that prison officials acted within their "broad discretion." *See*

*Shaw v. Murphy*, 532 U.S. 223, 232 (2001).   Nevertheless, prison administrators

must come forward with a legitimate governmental interest that justifies the

regulation, and they must demonstrate a rational connection between the policy

and that interest. *Jones*, 461 F.3d at 360 (3d Cir. 2006) (citing *Wolf v. Ashcroft*,

297 F.3d 305, 308 (3d Cir. 2002)).   Although we shall accord substantial deference

to their professional judgment, *see Overton*, 539 U.S. at 132, the defendant

administrators' evidence must "amount to more than a conclusory assertion." *Id.*

In considering whether the policy adopted at USP Lewisburg, banning

inmates from maintaining UCC-related materials, was (or is) reasonable, we look to the Third Circuit's opinion in *Monroe v. Beard* for guidance.    In *Monroe*, 536 F.3d 198 (2008)(per curiam), the Third Circuit found that state-prison officials did not violate the First Amendment by seizing from inmates' personal property "publications and Uniform Commercial Code (UCC) materials" pursuant to a policy adopted and implemented by the Pennsylvania Department of Corrections. To that end, the Circuit Court agreed with the district court that a rational nexus existed between the prison's penological interests – protecting prison administrators and other government officials in addition to regulating and preventing criminal activity from within the prisons -- and the means used. *Id.* at 207-08.    Furthermore, the Circuit Court observed that the inmates still had available to them a wide-range of legal materials and publications not pertaining to the filing of fraudulent liens; that accommodating the inmate's rights to possess UCC materials may encourage them to harass, intimidate, or threaten prison officials, including guards and administrators, by threatening to file liens; and that no alternative measures presenting a *de minimis* cost to the prison was presented. *Id.* at 208-09.  The Circuit Court also emphasized "the unique problem that [UCC filings] pose: Although the perpetrator can file the lien with relative ease, the victim must go through a complicated ordeal, such as to seek judicial action, in order to remove the lien.  A court order to expunge the lien does not end the ordeal,

69

as oftentimes the victim must then resolve his credit report, which typically will have been damaged by the time he discovers that the lien was filed." *Id.* at 209; *see also, Moultrie v. Sec'y Fla. Dep't of Corr.*, 2010 WL 555559 (M.D. Fla. Feb. 10, 2010) (collecting cases across the Country documenting the abusive practice of prisoners filing baseless liens and/or UCC financing statements for the purpose of harassment and credit impairment of the alleged debtor (almost always a state or federal official involved with securing the prisoner's incarceration)).

Nearly three months after *Monroe* was decided, the Third Circuit had occasion to affirm a federal district court decision that UCC-related material was not legal work, and also concluded that the Pennsylvania Department of Corrections' contraband policy was not unconstitutional. *See Edmonds v. Sobina*, 296 F. App'x 214 (3d Cir. 2008).

Presented with *Monroe* and *Edmonds*, coupled with what we know about the policy adopted at USP Lewisburg, we do not hesitate in finding that the policy at USP Lewisburg was (or is) reasonable. To that end, the policy at USP Lewisburg permits inmates to appeal the confiscation of UCC-related materials, was adopted following the enactment of the Court Security Act, and that, based on our own experience, federal inmates have access to a wide-range of legal materials that do not reference the UCC.

**f. The Ban on "Plain Nudity."**

70

Here, Brooks challenges the constitutionality of the Ensign Amendment and the BOP's policies and procedures, adopted at USP Lewisburg, relating to the ban on certain publications, or as Brooks refers to them, publications containing "plain nudity." *Doc.* 38 at ¶ 4.   While he does not define the term "plain nudity," we understand that his challenge to the statute and corresponding policies and procedures relates to the rejection of certain photographs and books that were sent to him; books that, according to Brooks solely contained sexually explicit written material, but no photographs.  *See id.*; *see also, Doc.* 102 at ¶ 151; *Doc.* 86-5 at 53. Thus, we understand Brooks to be challenging the statute, policies, and procedures as being overbroad.  Accordingly, we must apply the *Turner* test, *supra*.

Bledsoe, however, does not explicitly proffer any penological interests for us to consider.  Rather, he merely points to this Court's decision in *Ramirez v. Pugh*, 486 F.Supp.2d 421 (M.D. Pa. 2007)(McClure, J.); consequently, we understand that he impliedly stands on the same penological interests discussed therein.

In *Ramirez*, the plaintiff-inmate sought to challenge the constitutionality of the Ensign Amendment and the BOP's procedures to implement the Ensign Amendment.  *See* 486 F.Supp.2d at 424-25.   The plaintiff's complaint was that federal inmates were unconstitutionally barred from receiving pornographic materials such as <u>Playboy</u> and <u>Penthouse</u>.  *See id.* at 423.  The Court rejected the plaintiff's challenge finding that the prison's ban on "such soft-core, non-obscene

71

materials" was rationally related to the legitimate penological interest of rehabilitating sex offenders and the general inmate population, in addition to the legitimate penological interest of institutional security. *Id.* at 430, 431, 433-34. Additionally, the Court found that there were alternative means of exercising the First Amendment right through the receipt of a broad range of publications that do not depict nudity (*id.* at 435); permitting possession of such materials could have a profound impact on other inmates and guards (*id.*); and plaintiff could not point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to the valid penological interests (*id.* at 435-46).

Without a concrete definition of "plain nudity," and in the absence of evidence demonstrating that the Ensign Amendment and corresponding BOP procedures are unreasonable, we find that judgment should be entered in Bledsoe's favor consistent with the Court's ruling in *Ramirez*.  Our recommendation, however, is limited to Brooks' challenge to the ban on publications containing "sexually explicit" images (i.e. the challenge to the Ensign Amendment and corresponding policy).  No court, as far as we are aware, has ruled on the constitutionality of the BOP's policy relating to the rejection of publications that fall outside of the scope of the Ensign Amendment, such as Brooks' books, at least one of which may not have contained any "sexually explicit" images.  Indeed, the Ensign Amendment solely refers to depictions, while the BOP's policy on rejecting

publications refers to those containing images and those that do not. Consequently, in the absence of a developed record on the reasonableness of a ban on purely written materials of a sexual nature, we are reluctant to extend the sound reasoning of *Ramirez* to this part of Brooks' challenge to the BOP's policy, adopted by Bledsoe at USP Lewisburg, and recommend that the motion be denied to this limited extent.

### g. Retaliation.[17]

Under the First Amendment, governmental actors are prohibited from "abridging the freedom of speech ... or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend I.   Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment. *See Allah v. Seiverling*, 229 F.3d 220, 224–25 (3d Cir. 2000). In the prison context, an individual's rights are lessened, but not extinguished, where legitimate penological interests must be considered in

---

[17]     Although we proceed under the First Amendment framework in ruling upon Brooks' retaliation claims, we recognize that the Supreme Court has been reluctant to extend the *Bivens* implied right of action to new contexts, and in recent cases has "conspicuously avoided" extending it to First Amendment claims. *Bistrian v. Levi*, 696 F.3d 352, 376 n. 9 (3d Cir. 2012)(citing *Reichle v. Howards*, 132 S.Ct. 2088, 2093 n. 4 (2012) and *Ashcroft v. Iqbal*, 556 U.S. 662, 675, (2009)).   The remaining defendants do not press this point, however, and "[the Third Circuit] . . . , relying on *Bivens*, has held that 'a federal cause of action for damages may be implied directly from the [F]irst [A]mendment,'" *Bistrian,* 696 F.3d at 376 n. 9 (quoting *Milhouse v. Carlson*, 652 F.2d 371, 374 (3d Cir. 1981) and citing *Paton v. La Prade*, 524 F.2d 862, 869–70 (3d Cir. 1975).

assessing the constitutionality of official conduct. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). To ultimately prevail on a retaliation claim under *Bivens*, a plaintiff must demonstrate (1) that he was engaged in protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001) (quoting *Allah*, 229 F.3d at 225); *Briener v. Litwhiler*, 245 F.Supp.2d 614, 632 (M.D. Pa. 2003).

Regarding the first element, "[t]he filing of grievances and lawsuits against prison officials constitutes constitutionally protected activity." *Mearin v. Vidonish*, 450 F. App'x 100, 102 (3d Cir. 2011) (citing *Milhouse v. Carlson*, 652 F.2d 371, 373–84 (1981)). Under the second element of a retaliation claim, plaintiffs must demonstrate that the Government responded with a retaliatory act. The test in our Circuit for determining whether an action is adverse is whether it is "sufficient to deter a person of ordinary firmness from exercising his constitutional rights." *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (internal quotation marks, citation, and alteration omitted). Finally, with respect to the third element, a plaintiff must sufficiently demonstrate a "causal link between constitutionally protected action and the adverse action taken…." *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002). Generally, a plaintiff "may demonstrate causation through a 'pattern of antagonism' following the plaintiff's protected

conduct or unusually suggestive temporal proximity" between the protected and retaliatory conduct. *Motto v. Wal–Mart Stores East, LP*, No. 11–2357, 2013 WL 1874953, at *8 (E.D. Pa. May 13, 2013) (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920–21 (3d Cir. 1997)). In doing so, a plaintiff must provide "a chronology of events from which retaliation may be inferred." *Bendy v. Ocean Cnty. Jail*, 341 F. App'x 799, 802 (E.D. Pa. 2009) (citations and internal quotations omitted).

If a plaintiff establishes a *prima facie* case of retaliation, the burden then shifts to the prison officials to demonstrate, by a preponderance of the evidence, that their actions would have been the same, even if the plaintiff were not engaging in the constitutionally protected activities. *Rauser*, 241 F.3d at 334 ("Once a prisoner has demonstrated that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."). "At the summary judgment stage, the plaintiff need only meet his burden of producing evidence from which a reasonable jury could conclude that the adverse action was taken in retaliation for the exercise of his protected rights." *Booth v. King*, 346 F.Supp.2d 751, 762 (E.D. Pa. 2004). "If the plaintiff produced evidence from which a reasonable jury could conclude that the exercise of his right

was a 'substantial and motivating factor' in defendants' actions, the ultimate question of causation must be decided by the fact-finder." *Id.*

Here, the remaining defendants do not dispute that Brooks may succeed on the first element. *See Doc.* 87 at 30. The remaining defendants, instead, focus primarily on the second and third elements in seeking dismissal or the entry of summary judgment.

**Mink's "False Accusation."**

Mink argues that Brooks fails to establish that he suffered an adverse action or demonstrate causation. *See Doc.* 106 at 11. In support of the first argument, Mink relies upon Brooks' own statement (*see Doc.* 38 at ¶ 3, p. 2) that he continued filing administrative remedies against her after the incident. *Id.* While such a statement is surely evidence for us to consider, it alone is not enough for us to say that a reasonable juror would find in Mink's favor, especially since the standard relates to whether the action was sufficient to deter a person of ordinary firmness from engaging in the constitutionally protected conduct.[18] Nonetheless, Brooks fails to explain, through admissible evidence, what kind of "strife" an inmate would normally encounter when accused of engaging in the act Mink accused him of doing, and whether he actually encountered that level of "strife."

---

[18]    Each of the remaining defendants asserts this argument, *see Doc.* 87 at 30, which we reject for the reason stated here.

Additionally, as before, Brooks never explains how her accusation "still follows [him]." Without this information, presented *via* admissible evidence, we recommend that judgment be entered in Mink's favor, because a reasonable juror could not find that he suffered an adverse action. Accordingly, we do not address whether Brooks has satisfied the causation element.

### Prutzman and Brooks' Personal Property.[19]

Here, Brooks' claim is that Prutzman stole and damaged some of his personal property for having previously filed a civil lawsuit against one of Prutzman's friends. In moving for dismissal or summary judgment, Prutzman argues that because the confiscation form at issue does not identify him, Brooks' retaliation claim -- that Prutzman stole some of his property -- should fail. *See Doc.* 87 at 31; *Doc.* 106 at 12. In addition, Prutzman argues that Brooks cannot show that either the alleged act of taking some of his property or pouring prayer oil over some of it was sufficiently adverse or tied to Brooks' constitutionally protected conduct. *See Doc.* 87 at 30.

With respect to Brooks' claim that Prutzman stole some of his personal property, we disagree that the claim should fail. While the confiscation form does not refer to Prutzman, the evidence as a whole, viewed in the light most favorable

---

[19]   To the extent Brooks seeks to accuse Prutzman of denying him sheets, blankets, and toilet paper, *see Doc.* 101 at 11, this claim should be denied. In his amended complaint, Brooks clearly blames "Officer Smith" for this conduct. *See Doc.* 38 at ¶ 4. He cannot now alter his claims through his brief in opposition.

to Brooks, demonstrates that after Prutzman searched through some of his property, some items were missing.  Similarly, the evidence, viewed in the light most favorable to Brooks, demonstrates that Prutzman had poured prayer oil on some of Brooks' property that was eventually returned to him after the search. Additionally, Prutzman told Brooks, upon returning the damaged items to him, that one of the defendants from Brooks' earlier civil lawsuit was a friend.  Provided with this evidence, a reasonable juror could find that Brooks establishes the causation element for both aspects of his claim.  Furthermore, a reasonable juror could find that the acts of stealing and destroying Brooks' property under the described circumstances could lead a person of ordinary firmness to refrain from engaging in constitutionally protected conduct.  This claim, therefore, should proceed.

### "The Planned Attack."

In this instance, we understand Brooks to be complaining that Kepner planned the altercation that occurred on May 13, 2011, in retaliation for Brooks having filed a grievance against him, and that Crawley further retaliated during the altercation by not providing Brooks with any assistance to stop the altercation.  *See Doc.* 38 at ¶ 7.  A finding of involvement by either Kepner or Crawley, or both, may call into question, or necessarily invalidate, Brooks' disciplinary charge of, and punishment for, fighting.  This is especially true here, where Brooks presented

a statement at the disciplinary hearing that he was solely acting in self-defense, and

Crawley's incident report, adopted by Jordan as a finding to support the finding of

guilt for fighting, included references to Brooks' claims that Kepner played a role

in the event.   Furthermore, to find that Crawley had any involvement in the

altercation would also seemingly call into question the statements he provided in

the incident report, which formed the basis for Jordan's finding of guilt.

Accordingly, we find and recommend that the Court dismiss these claims pursuant

to the rule announced in *Heck* and extended in *Edwards, supra.*[20]

### Young's Rejection of Books Sent to Brooks.

Finally, although not squarely addressed in the pending motion, we liberally

construe Brooks' complaint to include a retaliation claim against Young for the

rejection of at least three books deemed to contain sexually explicit written

material, but no images.   According to Brooks, said books were rejected solely

because of "the animosity" leveled towards him from his prior lawsuit and more

recent administrative remedies.   *See Doc.* 38 at ¶ 14.

In raising this claim, Brooks misreads the BOP's policy; a policy adopted

and undisputedly implemented at USP Lewisburg.   While the Ensign Amendment

exempts written materials from being rejected, the BOP's policies and procedures

---

[20]   With particular focus on Crawley, we would alternatively recommend that Brooks' retaliation claim against him be denied to the extent that Brooks fails to demonstrate causation.

still permit the Warden, or Acting Warden, to reject publications that are considered detrimental to the security and good order of the institution. Additionally, regardless of whether the policy is later deemed unreasonable, Brooks fails to allege or point to evidence in the record demonstrating that Young, when rejecting the books at issue, did so because of constitutionally protected conduct in which Brooks was engaged.  Thus, we recommend that this claim be dismissed.

### 5.  Qualified Immunity.

The only surviving claim at this point in the Report is Brooks' retaliation claim against Prutzman.  Prutzman fights on, however, contending alternatively that he cannot be held liable pursuant to the doctrine of qualified immunity.

Explicit in the doctrine's title, the doctrine of qualified immunity provides officials performing discretionary functions not only a defense to liability, but also "immunity from suit."  *Crouse v. S. Lebanon Twp.*, 668 F.Supp.2d 664, 671 (M.D. Pa. 2009) (Conner, C.J.) (citations omitted). Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries.

First, a court must evaluate whether the defendant violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001), *abrogated in part by Pearson v. Callahan*, 555 U.S. 223 (2009); *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir.

2007); *Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. *Saucier*, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, however, a court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. *Pearson*, 555 U.S. at 232; *Saucier*, 533 U.S. at 201–02.

A federal court, however, is no longer required to conduct these two inquiries sequentially, *Pearson*, 555 U.S. at 239–40, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. *Id.* Moreover, where a court elects to address the alleged constitutional violations, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. *Gruenke v. Seip*, 225 F.3d 290, 299–300 (3d Cir. 2000); *Crouse*, 668 F.Supp.2d at 671; *see also Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record ... to establish ... a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).")

As evident, the doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," and it "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotation omitted). Explained further, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

With particular respect to the determination of whether a right is clearly established under the qualified immunity doctrine, "[the Supreme Court] does not require a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S.Ct at 2083. In some cases, though, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Wilson*, 455 F.3d at 191 (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)).

Having already determined that Brooks' retaliation claim against Prutzman should not be dismissed and that judgment should not be entered in his

(Prutzman's) favor, we turn to the second part of the qualified immunity analysis. Here, the evidence demonstrates that Prutzman retaliated against Brooks for having previously exercised his right of access to the courts by filing a federal lawsuit against one of Prutzman's friends.  In *Atkinson v. Taylor*, 316 F.3d 257, 269–70 (3d Cir. 2003), the Third Circuit held that prison officials were not entitled to qualified immunity from a prisoner's claim that defendants retaliated against him for filing a civil rights suit. In so holding, the *Atkinson* court recognized that in *Milhouse v. Carlson*, 652 F.2d 371 (3d Cir. 1981), the court already "clearly established a prisoner's right to access the courts so that a reasonable prison official would know that he violates this right if he retaliated against a prisoner for filing a lawsuit." *Atkinson,* 316 F.3d at 269.  Furthermore, the *Milhouse* court stated that "[t]he right of access to the courts must be 'adequate, effective and meaningful,'... and must be freely exercisable without hindrance or fear of retaliations." *Milhouse*, 652 F.2d at 374 (internal citations omitted). Thus, the Third Circuit has already determined that the right to be free from retaliation for exercising one's right of access to courts is a clearly established right.  Moreover, based on the record presented, we doubt that a plausible argument could be made that the act of stealing and pouring liquid onto Brooks' property, because he (Brooks) had filed a lawsuit against one of his (Prutzman's) friends, was legally permissible. Thus, we recommend that the qualified immunity defense be denied to Prutzman.

### 6.  The FTCA Claims.

As we understand Brooks' amended complaint, he raises claims against the United States under the FTCA for the unlawful taking and destruction of his personal property on March 24, 2011, and with respect to the events surrounding the altercation he had with the other inmate on May 13, 2011.  The Government seeks to have each claim dismissed.

### a.  Sovereign Immunity.

According to the Government, Brooks' claim relating to the unlawful taking and destruction of his personal property on March 24, 2011, should be dismissed for lack of subject-matter jurisdiction, because the Government has not waived its sovereign immunity to be sued.  Under the FTCA, the United States waives sovereign immunity from suits in tort and gives federal district courts exclusive jurisdiction over claims against the United States for "injury or loss of property ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see Millbrook v. United States*, 133 S.Ct. 1441, 1443 (2013).  "This broad waiver of sovereign immunity is subject to a number of exceptions [and exemptions]. . . ."  *Millbrood*, 133 S.Ct at 1443.

84

As the Government argues, exempted from the general waiver of sovereign immunity is "[a]ny claim arising in respect of the ... detention of any ... property by ... any ... law-enforcement officer."  28 U.S.C. § 2680(c).  Furthermore, in *Ali v. BOP*, 552 U.S. 214, 228 (2008), the Supreme Court held that corrections officers are covered by the term "any law enforcement officer," thus precluding liability based upon a claim that federal prison officials caused the loss of an inmate's property.

Since the decision in *Ali*, courts have recognized that FTCA claims similar to those presented by Brooks are subject to dismissal.  *See, e.g., Krug v. United States*, 442 F. App'x 950 (5th Cir. 2011)(affirming district court's dismissal of plaintiff's FTCA claim alleging that a BOP employee stole his property); *see also, Robinson-Bey v. Feketee*, 219 F. App'x 738, 741-42 (10th Cir. 2007)(affirming, pre-*Ali*, the district court's dismissal of plaintiff's claim that BOP prison staff disposed of *or stole* his personal property); *Ysassi v. Spalding*, No. 14-2372, 2015 WL 269143, at *3 n. 2 (M.D. Pa. Jan. 21, 2015)(noting that even if plaintiff's claim were construed under the FTCA, "any property deprivation/*destruction* claim . . . would also be subject to dismissal [because of the exemption in 28 U.S.C. § 2680(c)].")(Emphasis added).  Moreover, contrary to Brooks' assertion, *Doc.* 101 at 15, neither the "intentional torts exception" nor the "law enforcement proviso" contained in 28 U.S.C. § 2680(h) saves his claim.  *See Millwood*, 133

S.Ct. at 1445 ("The plain language of the law enforcement proviso answers when a law enforcement officer's 'acts or omissions' may give rise to an actionable tort claim under the FTCA.  The proviso [also] specifies that the conduct must arrive from one of the six enumerated intentional torts and . . . the law enforcement officer's 'act or omission' must fall 'within the scope of his office or employment.'"); *accord id.* ("The FTCA's only reference to 'searches,' 'seiz[ures of] evidence,' and 'arrests' is found in the statutory definition of 'investigative or law enforcement officer.' [citations omitted]. By its terms, this provision focuses on the *status* of persons whose conduct may be actionable, not the types of activities that may give rise to a tort claim against the United States.")(Emphasis in original).

### b.  Brooks' Negligence Claim.

In his amended complaint, Brooks alleges that the United States should be held liable for the personal injuries he suffered as a result of the altercation that occurred on May 13, 2011.  On this claim, Brooks' seeks $12,000 in compensatory damages and it is premised on a theory of negligence.  *See Doc.* 38 at ¶¶ 7, 18; *see also, Doc.* 101 at 15-16.  The Government contends that Brooks has failed to demonstrate a *prima facie* case.

The FTCA "provides a mechanism for bringing a state law tort action against the federal government in federal court" and the "extent of the United

States' liability under the FTCA is generally determined by reference to state law."

*In re Orthopedic Bone Screw Product Liab. Litig.*, 264 F.3d 344, 362 (3d Cir.

2001) (quoting *Molzof v. United States*, 502 U.S. 301, 305 (1992)). Where a

federal court is presented with a claim brought under the FTCA, it applies the law

of the state in which the alleged tortious conduct occurred. 28 U.S.C. § 1346(b). In

this case, the allegedly tortious conduct occurred in Pennsylvania, and thus we

refer to Pennsylvania tort law to assess the extent of the United States' potential

liability on Brooks' negligence claim.

Under Pennsylvania law, in order to "establish a cause of action for

negligence, the plaintiff must prove the following elements: (1) a duty or

obligation recognized by law; (2) a breach of that duty; (3) a causal connection

between the conduct and the resulting injury; and (4) actual damages." *Northwest*

*Mutual Life Ins. Co. v. Babayan*, 430 F.3d 121, 139 (3d Cir. 2005) (citing

*Pittsburgh Nat'l Bank v. Perr*, 637 A.2d 334, 336 (Pa. Super. Ct. 1994)). In

accordance with this standard, a plaintiff bears the burden of proving by a

preponderance of the evidence that the defendant's negligence was the proximate

cause of his injury, *Skipworth v. Lead Industry Association*, 690 A.2d 169, 172 (Pa.

1997), which is defined as causation which was a substantial factor in bringing

about the injury alleged, *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280, 1284 (Pa.

1978).

Despite application of the law of the state where the tortious act occurred, it has been recognized that the United States' duty of care to a federal prisoner is that of ordinary diligence. *Fiore v. Holt*, 435 F. App'x 63, 66 (3d Cir. 2011). (citing 18 U.S.C. § 4042).   Furthermore, factors that Pennsylvania courts consider in determining whether a defendant's conduct is a substantial factor in bringing about harm to another are: "(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it; (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the point of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (c) lapse of time." *Lux v. Gerald E. Ort Trucking, Inc.*, 887 A.2d 1281, 1287 (Pa. Super. Ct. 2005).  As another court has explained:

> A determination of legal causation, essentially regards "whether the negligence, if any, was so remote that as a matter of law, [the actor] cannot be held legally responsible for [the] harm which subsequently, occurred." *Novak [v. Jeannette Dist. Mem. Hosp.*, 600 A.2d 616, 618 (Pa. Super. Ct. 1991) (citation omitted)]. Therefore, the court must determine whether the injury would have been foreseen by an ordinary person as the natural and probable outcome of the act complained of. *Merritt v. City of Chester*, 496 A.2d 1220, 1221 (1985).

*Reilly v. Tiergarten Inc.*, 633 A.2d 208, 210 (1993).

The evidence in this case, viewed in accordance with the appropriate legal standard, *supra*, reveals that while Kepner was not the "floor officer" on May 13,

2011, he may have had input into the composition of the recreation groups. *See Doc.* 86 at ¶ 46. Furthermore, Brooks' evidence demonstrates that while he was on his way to recreation, Kepner grinned at him and stated "[l]et's see how this works out." *See Doc.* 75-1 at 2, 11. Subsequently, once Brooks was on his way into the recreation cage, he immediately became involved in an altercation with another inmate who charged at Brooks. *Doc.* 86 at ¶ 52. According to Brooks, that inmate was never before part of his recreation group. The evidence further reveals that neither Brooks nor the other inmate were on "single" recreation status, otherwise they would not have been assigned to the same recreation cage. *Doc.* 86 at ¶¶ 66, 67. It also remains disputed whether Brooks suffered any injuries from the altercation. To that end, Brooks attests that he suffered bruises on his body and face in addition to a bite mark on his chest. *Doc.* 102 at ¶ 63; *see also, Doc.* 75 at ¶¶ 4-5. Brooks, though, does not provide any detailed descriptions of the injuries he claims to have suffered. As well, a medical record introduced by the defendants provides that Brooks sustained no injuries from the altercation. *See Doc.* 86 at ¶¶ 62-63.

Provided with these disputed facts, there appears to be a genuine issue for trial as to whether the Government could be held negligent for the altercation in which Brooks was involved. If the jury were to credit Brooks' evidence that Kepner smiled at him and made the aforementioned statement almost immediately

prior to the fight occurring, then it could reasonably conclude that, at minimum, the Government, *via* Kepner, had knowledge that Brooks could be injured.   As well, even though the act of initially attacking Brooks may have been an intentional act on part of the other inmate, Kepner's awareness of the event would prevent the Government from being severed from liability.   Furthermore, while Brooks does not detail his injuries, were the jury to find that he suffered the stated injuries, he could receive some level of compensation; albeit an amount less than that he requested in his administrative tort claim.   As such, this claim should proceed.   *See generally, Schingler v. United States*, No. 13-1388, 2014 WL 980804, at *10 (M.D. Pa. Jan. 23)(Schwab, Mag. J.)(recommending that the Government's motion to dismiss be denied with respect to plaintiff's FTCA claim, wherein it was alleged that the Government was negligent for placing plaintiff in a cell with an inmate who the defendants knew posed a risk to the plaintiff), *report and recommendation not adopted to this extent for other reasons in* 2014 WL 980757, at *3-*5 (Mar. 13, 2014)(Munley, J.).

### c. Brooks' FTCA Issues in His Own Motion for Summary Judgment.

In his partial own motion for summary judgment, Brooks includes, *inter alia*, the following issues: (1) whether staff was negligent for including an "unstable" inmate in his recreation group; (2) whether staff was "obligated to protect [inmates] who are not allowed to defend themselves;" (3) whether the

90

staff's "refusal to offer [him] a means of retreat [during the altercation] show[ed] negligence;" (4) whether the staff's "refusal to interfere [during the altercation] show[ed] negligence;" (5) whether the "denial of access to medical treatment constitute[d] an act of ordinary negligence;" and (6) whether the denial of the "right to a witness involving good time loss violate[d] due process, and denial of self defense (sic)." *See Doc.* 75 at 3. The Government contends that Brooks failed to exhaust these claims before raising them here.

As a prerequisite to a suit under the FTCA, a claim first must be presented to, and denied by, the federal agency. The FTCA provides:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury ... unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a). The purpose of § 2675(a) is to insure that the relevant agency will have notice of the claimant's allegations, so that "it may investigate the claim and respond either by settlement or by defense." *Tucker v. United States Postal Serv.*, 676 F.2d 954, 958 (3d Cir. 1982). Moreover, "[t]he statutory language is clear that a court does not have jurisdiction before administrative remedies have been exhausted, and a court must dismiss any action that is initiated prematurely." *Wilder v. Luzinski*, 123 F.Supp.2d 312, 313 (E.D. Pa .2000) (citing *McNeil v. United States*, 508 U.S. 106 (1993); *Wujick v. Dale & Dale*, 43 F.3d 790, 793–94

(3d Cir. 1994)).

Here, Brooks filed Administrative Tort Claim Remedy Number TRT-NER-2011-04509, and complained that he had recreated with the same group of inmates for over one month without incident, but that Kepner had intentionally switched the groups knowing that an altercation would ensue. *See id.* at ¶ 167; *Doc.* 86-5 at 43. In the same Remedy, Brooks complained that he was subsequently issued an incident report for fighting which subjected him to possible punishment. *Doc.* 86-5 at 43. Brooks Remedy was denied on July 29, 2011, because Brooks did not state a claim or provide a description of his actual injuries. *Id.* at 40. Nowhere in his Administrative Tort Claim did Brooks mention the issues that he raises in his motion for summary judgment.

Brooks nevertheless asserts that he later filed a request for reconsideration of the denial of his administrative remedy. *See Doc.* 95 at 1. In support thereof, Brooks attaches a handwritten document purporting to be the filing he submitted in support of his request for reconsideration. *Id.* at 2-3. Said request was received by the Regional Office on September 15, 2011, and referenced the following: (1) his injuries to include multiple bruises; (2) Crawley stood idly by and did not offer a means of escape; (3) Crawley filed a false incident report; (4) George did not provide him with a medical assessment; (5) staff at USP Lewisburg are working

together to engage in a pattern or practice of retaliatory conduct against him for engaging in constitutionally protected activities; (6) Kepner orchestrated the incident; and (6) the other inmate had had multiple, violent altercations before this incident.  *See id.*

As far as we can tell, the Government never responded to this assertion. Moreover, Brooks further asserts that his request for reconsideration was ultimately denied.  *Doc.* 95 at 1.  As such, there appears to be a factual dispute about whether Brooks has properly exhausted the claims raised in his own motion for summary judgment.  Until the exhaustion issue is settled, we decline to make a finding or recommendation on whether summary judgment should be granted in favor of either party.[21]

V.  **Recommendations.**

For the foregoing reasons, **WE RECOMMEND** that:

a.  Defendants "Officer Smith" and the "Unknown Defendants," with the exception of George, who Brooks has identified, be **DISMISSED** pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.

b.  The moving defendants' motion to dismiss or for summary judgment (*Doc.* 69) be **GRANTED IN PART** and **DENIED IN PART** as follows:

---

[21]    In the original administrative tort claim remedy and in the request for reconsideration, Brooks references Kepner's alleged involvement in the altercation.  Thus, as provided, we address the merits of that particular aspect of his FTCA claim.

1. The motion should be **DENIED** with respect to:

   a. Brooks' retaliation claim against Prutzman.

   b. Brooks' claim that the BOP's policy, adopted at USP Lewisburg, which bans inmates from possessing sexually explicit written materials, violates the First Amendment.

   c. Brooks' FTCA claim for personal injuries, based upon a negligence theory of liability.

2. The motion should be **GRANTED** to the extent that:

   a. Brooks' request for injunctive relief is moot.

   b. Brooks' *Bivens* claims against the United States and the moving defendants, in their official capacities, for money damages, are barred by sovereign immunity.

   c. Brooks fails to allege that the moving defendants had personal involvement with the *Bivens* claims in which he alleges that he was (1) sent to recreation in an ice covered cage; (2) denied sheets, blankets, and toilet paper; (3) exposed to tear gas on February 16, 2011, with the fans intentionally turned off; (4) denied medical attention on February 16, 2011, when tear gas was deployed; (5) denied a shower on April 1, 2011; (6) double celled in a small cell with incompatible cellmates and no room to exercise, and retained in shackles for a lengthy period of time; (7) subjected to conditions of confinement to include the lack of duress buttons, ladders to access the top bunk bed, storage room for personal belongings, or multiple desks upon which the cellmates could each have a place to sit and eat; (8) placed in the SMU at USP Lewisburg on prison blocks with inadequate ventilation and limited showers; and (9) denied certain visitation privileges as an inmate placed in the SMU program at USP Lewisburg.

   d. Brooks failed to exhaust his claim that Kepner denied him recreation on April 14, 2011.

e.  Brooks fails to state a claim against Mink, or alternatively, the evidence demonstrates that Mink is entitled to summary judgment.

f.  The evidence demonstrates that judgment should be entered in Prutzman's favor on Brooks' due process claim relating to the unlawful taking and destruction of his personal property

g.  Brooks fails to state a claim against George, or alternatively, the evidence demonstrates that George is entitled to summary judgment.

h.  Brooks' due process claims stemming from the disciplinary hearing in addition to his retaliation claims against Kepner and Crawley are barred by *Heck* and *Edwards*.

i.  The ban on UCC-related materials at USP Lewisburg is (or was) reasonable.

j.  The ban on "plain nudity" images at USP Lewisburg is (or was) reasonable.

k.  Brooks fails to state a retaliation claim against Young, or alternatively, the evidence demonstrates that Young is entitled to summary judgment.

l.  Sovereign immunity bars Brooks' FTCA claim for the alleged unlawful taking ("stealing") and destruction of his personal property.

3.  Brooks' own motion for summary judgment (*Doc.* 73) should be **DENIED** because:

a.  Brooks' claims stemming from the disciplinary hearing are barred by *Heck* and *Edwards*.

b.  There is a factual dispute about whether Brooks has exhausted the FTCA claims addressed in his motion for summary judgment.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Submitted this **31st** day of **March 2015**.

> _**S/ Susan E. Schwab**_
> Susan E. Schwab
> United States Magistrate Judge